JOSEPHINE WOJTCZUK *v.* PAULINE OLEKSIK

[No. 62, January Term, 1935.]

*Decided April 12th, 1935.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Charles C. Lyons,* with whom was *Charles E. Moylan* on the brief, for the appellant.

*Richard E. Preece,* with whom was *Malcolm J. Coan* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

On the 14th day of August, in the year 1930, Philip Zawistowski insured his life in the Mutual Life Insurance Company, of Baltimore, in the sum of $1,000. The policy is classified as an ordinary life, the premiums being payable throughout the life of the insured. At the time the policy was issued, the estate of the insured was designated as beneficiary, and the first premium was paid with money borrowed from the appellee in this case, which was afterwards repaid by the insured. All subsequent premium payments were paid by the appellee at the request of the insured, and upon his promise to repay them whenever he became able to do so. This promise was not complied with. Zawistowski was single at the time he insured his life, and remained single to the date of his death. At that time he worked as a long-shoreman, under the foremanship of the husband of the appellee, and he lived at the home of his foreman as a boarder. He had known the appellee for about four years and called her "Aunt Pauline," although he was no relation to her.

The full policy is set out in the record, and among its provisions is found the following:

"*Change of Beneficiary.* The insured, with the assent of the assignee when there is an existing assignment made as hereinafter provided, other than the assignment to the Company as collateral security for a policy loan, may while this policy is in force designate a new Beneficiary, reserving the right of revocation by filing written notice thereof at the Home Office of the Company, accompanied by this policy for endorsement; such change shall take effect on the endorsement of the same on this policy by the Company and not before. Should there be no beneficiary left at the time this policy becomes a claim by death, the proceeds hereof shall be paid to the executors, administrators and assigns of the insured."

Acting under the direction of the foregoing clause in the policy, the insured, on November 8th, 1930, executed a paper for the purpose of changing the beneficiary, said

paper being as follows: "November 8, 1930, To the Mutual Life Insurance Company of Baltimore, notice is hereby given of a change of beneficiary under policy No. 93400. The rights as beneficiary under said policy in Estate of the Insured are this day cancelled and withdrawn and Pauline Oleksik (Aunt) is hereby constituted and appointed beneficiary under said policy. The undersigned hereby warrants the change of beneficiary hereunder to be strictly within the provisions of said policy. Philip Zawistowski. Witness, George A. Lewandowski.

And in accordance with the aforegoing designation, the insurer placed the following endorsement upon the policy: "Beneficiary under this policy is hereby changed to Pauline Oleksik—Aunt, reserving the right of revocation, this 26th day of November, 1930. E. C. Brockenbrough, Registrar."

The policy as thus endorsed was delivered to the appellee, and remained continuously in her possession until after the death of the insured, when she voluntarily delivered the same to the insurer.

Some time after it was issued, Philip Zawistowski developed tuberculosis, and was unable to work continuously. He ceased to live permanently at the home of the husband of the appellee; went to the country for a while; and at other intervals was confined in a hospital for treatment. He continued, however, to visit the home of the appellee and her husband until his last illness. This latter illness covered the period from October 6th, 1932, to May 3rd, 1934, when he was a patient at the City Hospital, Baltimore, and the period from May 3rd, 1934, to June 15th, 1934, when he was a patient at the State Hospital for the Insane at Springfield, Md., where he died on the latter date.

On May 2nd, 1934, the day before the insured was transferred from the tuberculosis ward of the City Hospital to the State Hospital for the Insane, the appellant, Mrs. Josephine Wojtczuk, who was his sister, visited the insured, accompanied by two agents or representatives of the insurance company, for the purpose of effecting a

change of beneficiary in the policy, from Mrs. Olesik to herself.

Alfred Kulacki, one of the agents, testified as to this conference with the insured as follows: "Q. What did you have to say when you got to the hospital? A. We bid him the time; said Good Morning. Then it was I asked him to sign. He didn't want to sign. It took him ten or fifteen minutes before he signed. Q. Did he say why he did not want to sign? A. He did make a remark he didn't want to do it; that was all. Q. Who did he say that to? A. To his sister. Q. Did he finally sign? A. Yes. Q. What happened during the ten minutes you stayed there? A. Mr. Amend and I were standing in the corner until he made up his mind to sign. Q. What was he doing? A. Talking to his sister. Q. What did you hear? A. He said he didn't think it was right. She did say, I brought these men out here. You said you would and now you won't. You will only make a fool of me. She said, I brought these men along and now you won't sign. After they spoke a while, he said he would sign."

The papers which the insured executed embraced the formal request for the change of beneficiary, and also a request for the issuance of a duplicate policy, upon the theory that the original policy was lost, although the evidence shows that Kulacki knew of the existence of the policy and that it was then in the possession of Mrs. Oleksik. They were signed in blank, and the beneficiary in the application for the change of beneficiary was not then named therein, but inserted by Kulacki later. Afterwards it was discovered that these papers were erroneously signed by the insured with a lead pencil, and within an hour Kulacki returned to the hospital and had new papers signed in ink. At this time the sister was not present, and it is not clear whether the blanks then signed were filled in before or after the signatures in ink. Kulacki further testified that he visited Mrs. Oleksik on the same day and requested her to give him the policy, telling her that the insured desired to change the beneficiary. Mrs. Oleksik refused to deliver the policy to the agent, telling

him that it belonged to her, whereupon the agent mailed the requests for change of beneficiary and issuance of a duplicate policy to the home office of the company.

John C. Kraft, manager of the policyholders' service department of the insurer, testified that these papers were not received at the home office until on or about May 7th, or 8th, 1934, and that it was then discovered that the application for duplicate policy was executed upon an improper form. He further testified that the company did not honor the request for change of beneficiary because, under its rules, when such application is made, it is necessary to obtain the signature of the existing beneficiary, and if that signature cannot be obtained, it is the practice of the company to notify the beneficiary of the desired change by registered mail. Upon receipt of registry notice that the letter of notification has been received by the beneficiary, but not before, a duplicate policy designating the substituted beneficiary will then be issued.

Such was the status of the papers designed to effect the change of beneficiary, when the insurer received information that the insured was not mentally competent to execute the papers at the time of their execution. On May 29th, 1934, the manager wrote Mrs. Wojtczuk, the proposed beneficiary, that it would be impossible to comply with her request and make the change, unless she would furnish the company with a statement from either Dr. Speer or Dr. McCleary, both of Baltimore, that the insured was mentally competent on May 2nd, the date on which he executed the papers. The demand of the manager of the company was not complied with, and no change of beneficiary from Mrs. Oleksik was noted on the policy.

Dr. Standish McCleary, a pathologist, and for thirty years one of the examiners in lunacy of the board of supervisors of city charities, testified that on May 3rd, the day following the date of the execution of the papers hereinbefore mentioned, he was called because Zawistowski had attempted suicide. He made a careful examination of the patient on that date and found him to be mentally

incompetent and incapable of executing a valid paper. Accordingly, he certified to the insanity of the insured, and later the patient was examined separately by another physician who likewise certified, in order that Zawistowski might be committed to the State Hospital for Insane, to which institution he was committed under the provision of section 32 of article 59 of the Public General Laws of Maryland.

Dr. McCleary found the patient depressed and suffering from paranoia, a mental unsoundness characterized by delusions, one of them being that he "thought other patients in the ward were plotting against him to do him harm." He further testified as follows: "Q. Is it usual in the course of mental diseases for the offset to be sudden? A. No, sir. It is a slow development. Q. Would a man in the condition you found this man on May 3rd, have lucid intervals? A. That is doubtful. I think his judgment—he might be lucid, but I think would be faulty. Q. Do you think if a paper was taken to him and he were told that if he signed it, he would be changing the beneficiary in his insurance policy from the person named therein to some one else, he would understand it and know what he was doing? A. He might understand it, but would not realize the importance of what he was doing. He might or might not have been in that condition. I do not know what his condition was when he signed the paper. Q. There would be no certainty. He might not be under the same delusion, due to the attitude of some person toward him? A. Quite so."

Dr. M. W. Jacobson, resident physician of the Baltimore City Tuberculosis Hospital, testified that he saw Zawistowski daily while he was at the City Hospital and that he saw him on May 2nd, 1934. He was asked in the course of his examination what was the patient's condition, as he found it on the latter date, and his reply was as follows: "I think I should have to tell the sequence of events leading up to that time to say what his mental condition was at that time. Zawistowski had such a far-advanced case of tuberculosis he knew it was but a short

time before he would die.  During the entire time he was at the hospital he became more and more depressed and finally the idea of suicide entered his mind, to do away with himself.  Each time I spoke to him he always knew who I was.  Apparently he always knew where he was. As to further statement of his mental condition I am not qualified to make an opinion."  He further testified as follows:  "Q. Even if he had not attempted to commit suicide on May 3rd, would you have taken steps to have him committed?  A. Previous to May 3rd Zawistowski had shown a tendency to be unruly; he was very much upset.  On several occasions we had some difficulty in taking care of him properly, although on May 3rd was the first time he attempted to commit suicide.  I believe that a week before that, the possibility of moving him caused him to attempt suicide, but May 3rd was the first time he attempted it."

Dr. Hosea W. McAdoo, a physician connected with the State Hospital for the Insane, at Springfield, Md., testified that the patient was committed to that institution on May 3rd, 1934, and remained there until the date of his death.  His testimony in part is as follows:  "By the Chancellor:  Q. It has been testified this man was suffering from paranoia; he was depressed and had paranoiac delusions; that he had attempted suicide.  His condition would be described in that way, one that is ordinarily of slow development, or something that comes on suddenly like an explosion: what would you say about this?  A. Ordinarily those things are of slow development, but precipitated by physical conditions sometimes develop rather rapidly.  Q. This man, according to the record, was thirty-four and was in an advanced stage of tuberculosis; would that probably cause a more rapid development than would ordinarily be the case?  A. Yes.  Q. By rapid development do you mean the thing may come on in twenty-four hours or thirty days?  A. Well, ordinarily, in mental work, thirty days is considered rather rapid."

Upon the decease of the insured, claims were filed with the insurer on behalf of Pauline Oleksik, the designated

beneficiary, and also on behalf of Josephine Wojtczuk, the sister and contending beneficiary, and on behalf of John Zawistowski, who, as father of the deceased, claimed as the next of kin and sole heir at law. The insurer, upon proper proof of death, admitted its liability for the full amount of the policy, but because of the conflicting claims filed a bill of interpleader in the Circuit Court of Baltimore City. The answers of the respective claimants were duly filed, and upon order of the court the parties were directed to interplead, Mrs. Oleksik being designated as complainant, and the other two claimants as defendants in the suit. At the hearing below, however, the defendant John Zawistowski, through his counsel, dismissed his claim, thereby narrowing the issue to the respective claims of the complainant, the regularly designated beneficiary in the policy, and the remaining defendant, as the alleged substituted beneficiary.

After a hearing in which testimony was taken in open court, the learned chancellor passed a decree awarding the full fund to Pauline Oleksik, and directing that the same be paid to her, less the proper costs of the proceedings, and less a counsel fee of twenty-five dollars to counsel for the insurer. It is from that decree that this appeal is taken.

There is some testimony in the record directed to the question of the kinship between Mrs. Oleksik and the insured, and the circumstance that she is designated in the policy as the aunt of Philip Zawistowski, whereas, in point of fact, she bore no relationship to him. It is true that the charters of some insurance or beneficial societies, designed to especially aid members of their organizations and certain designated lines of family connections, permit only kinsmen to be designated as beneficiaries, but where there is no such requirement by the insurer, as in the instant case, an erroneous statement of relationship does not affect the claim of the beneficiary. *American Legion of Honor v. Green*, 71 Md. 263, 17 A. 1048. In *May on Insurance* (4th Ed.) vol. 2, sec. 399 E., it is said: "A policy of life insurance for the benefit of one not

a relative is not against public policy, and if it were, no one but the insurer could raise the question. It could not avail his heirs." It follows from what we have said that the designation of Mrs. Oleksik as aunt of the insured does not affect her status as a claimant of the fund.

The appellant contends that the failure of the insurer to change the beneficiary in the policy, under the facts in this case, should not be so construed as to result in injury to her, because the insured had performed every act within his power to effect the change; and upon the general principle that equity regards as done that which ought to be done, her rights should not be prejudiced by the failure of the company to change the beneficiary. Such a principle is well recognized, and is applied where the facts warrant its application. *Reliance Ins. Co. v. Bennington,* 142 Md. 390, 121 A. 369; *Daly v. Daly,* 138 Md. 155, 113 A. 643. There is a variance, however, between the facts cited in the above cases, and the facts in the instant case, in that the policy here was not surrendered to the company, the request for a duplicate policy was not executed upon the forms required by the company, and, as will be observed by reference to the aforegoing quotation from the policy, it is expressly stipulated that a change of beneficiary shall take effect on the endorsement of the same on the policy by the company, and not before. Besides, in the instant case, the more serious and important issue of capacity to execute a valid deed or contract is involved.

In *Gesell v. Baugher,* 100 Md. 677, 60 A. 481, this court said: "Testimony, in order to be legally sufficient to overthrow the presumption in favor of sanity and capacity, must be directed to the date of the execution of the will, and must tend to show that the testator was at that time incapable. For the purpose of shedding light on his condition at that time, but for no other purpose, evidence of his bodily and mental condition both before and afterwards may be produced. *Davis v. Calvert,* 5 G. & J. 269; *Brashears v. Orme,* 93 Md. 442, 49 A. 620. But if the opinion of the witness is desired to prove, not

capacity, but incapacity, the question put to him must be such as to limit the inquiry to the date of the making of the will. *Jones v. Collins,* 94 Md. 403, 51 A. 398; *Brashears v. Orme, supra."* And in *Cooley's Briefs on Insurance* (2nd Ed.) vol. 7, p. 6467, it is said: "A change of beneficiary, to be given effect, must appear to have been made understandingly, and if it is shown that there was fraud or undue influence, or lack of mental capacity, the attempted change will be regarded as inoperative."

Briefly, the authorities are in accord to the effect that the degree of mental capacity necessary to change a beneficiary in one's policy is the same as that necessary to execute a will, or a valid deed or contract. And using this standard in reaching our conclusion, we cannot find that Zawistowski possessed such capacity on May 2nd, 1934.

On May 3rd, according to the testimony of Dr. McCleary and Dr. McAdoo, he was found to be suffering from paranoia. Their description of the characteristics of that disease, namely, that it is of slow development, and not of sudden outburst, makes it inevitable that if, as was the fact, he was examined and certified to be insane on May 3rd, 1934, he must have been suffering from the same malady on the day previous. Again, the testimony of Dr. Jacobson, who saw the patient on May 2nd, is significant, in that he described the insured as being "unruly" and "very much upset" prior to May 3rd. Such testimony, in addition to a combined effect upon the physical and mental system of the insured, through the steady progress of advanced tuberculosis and paranoia, leads us to the conclusion that the decree appealed from should be affirmed.

While not a controlling factor in the decision we have here reached, we deem it not out of place to refer to the circumstance that the appellee and not the insured paid out of her own resources every premium on the policy except the first, and for these advances, made at the request of the insured, she has not been reimbursed.

*Decree affirmed, with costs.*