## LYNN *v.* MAGNESS

[No. 40, October Term, 1948.]

*Decided December 10, 1948.*

*Rehearing denied January 12, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, HENDERSON, and MARKELL, JJ.

*Joseph T. Brennan,* with whom were *Calvert K. Hartle* and *Charles Ruzicka* on the brief, for the appellant.

*James C. Burch* and *L. Wethered Barroll, Jr.,* with whom were *Preston P. Heck* and *L. Wethered Barroll, Sr.,* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This is a contest for the life insurance payable by Aetna Life Insurance Company under three policies insuring Dr. Samuel Lee Magness, now deceased. The contesting claimants are the insured's widow, Stella E. Magness, of Rock Hall, and his son-in-law, Edward J. Lynn, of Hagerstown.

For many years Dr. Magness engaged in the general practice of medicine in Baltimore. His home and office were located at 1206 East Preston Street. Dr. and Mrs. Magness had one son, Stephen Lee, and one daughter, Eleanora. In January, 1926, Eleanora married Lynn, a tobacco salesman, and the couple thereafter occupied an apartment on the third floor of the doctor's building. In 1928 the doctor's health began to fail. He had been overexerting himself to attend to a large practice, and had been relying heavily on alcoholic stimulants. Dr. Daniel Miller, who assisted him in his practice from 1930 to 1933, found that, in addition to high blood pressure and hardening of the arteries, he had developed Bright's disease.

After Dr. Magness became addicted to alcoholic stimulants, his medical practice decreased, and in June, 1932, he became financially embarrassed. However, he had in his possession five Aetna insurance policies, and so he planned to cancel one of them for its cash surrender value. Mrs. Magness, however, was hopeful that he would be able to keep his insurance policies so that she would not lose the disability benefits in case of his illness. The doctor decided to turn over to Lynn a $3,000 policy, which had been issued to him in 1924. Lynn agreed to give the doctor the cash surrender value of the policy and pay the annual premiums as long as the doctor lived, if the doctor would make him beneficiary. The main office of Aetna Life Insurance Company is in Hartford, Connecticut, but Dr. W. Edward Magruder, Aetna agent in Baltimore, arranged to make the change of beneficiary. The change was made on June 15, 1932, and the agent brought the policy to the doctor's office on June 18. The new beneficiary clause thereon provided: "The net sum payable by the Company under this policy by reason of the death of the insured is hereby made payable to Edward J. Lynn, son-in-law of the insured, if he survives the insured; otherwise to the executors, administrators or assigns of the insured." The agent presented the policy to Lynn, and Lynn thereupon gave the doctor a cashier's check for $519.14, the cash surrender value, and paid the agent $50.23, the annual premium.

Within two months the doctor was again in need of money, and he offered to turn over to Lynn two more Aetna policies, one for $2,000, the other for $3,000, both issued in 1920. Lynn testified that he showed the first policy to his wife, and they were not entirely satisfied with the beneficiary clause. He explained on the witness stand that he drove his wife and son frequently to Rock Hall, and he meditated on the eventualities in case they should be unfortunate enough to have an automobile accident. He discussed the matter with Dr. Magruder, the insurance agent, and he promised to fix the beneficiary clauses so that if he and his wife and boy were

killed in an accident, the insurance would come to his estate. He quoted the agent as saying: "After all, it is your money, and Dr. Magness has the benefit of the double disability clause." On August 29, 1932, Dr. Magness, then 55 years old, signed a request to change the beneficiary clause in the two 1920 policies and also in the 1924 policy. The agent arranged to make the beneficiary clause the same in all three policies, and when he brought them to the doctor's office on September 3, each clause provided as follows: "The net sum payable by the Company under this policy by reason of the death of the insured shall be payable to Edward J. Lynn, son-in-law of the insured, if he survives the insured; otherwise to Eleanora V. Lynn, daughter of the insured, if she survives the insured; otherwise to Carns E. J. Lynn, grandson of the insured, if he survives the insured; otherwise to the executors, administrators or assigns of said Edward J. Lynn." The agent presented all three policies to Lynn, and Lynn gave the doctor a check for $1,252.60, the cash surrender value of the two additional policies.

Dr. Magness continued to practice medicine nearly two years longer, although his health was growing gradually worse. In August, 1934, he suffered a paralytic stroke, and his wife promptly filed a petition in the Circuit Court of Baltimore City alleging that he was receiving monthly disability payments under five insurance policies, and was unable to manage his own affairs. Acting upon that petition the Court on September 4 appointed Mrs. Magness committee to manage her husband's personal estate. She acted in that capacity for more than a year; but on January 31, 1936, she filed another petition alleging that her husband had "returned to a normal condition" and was able to care for himself and manage his own financial affairs, whereupon the Court dismissed her as committee. In 1940 Dr. and Mrs. Magness moved to Rock Hall. On December 24, 1942, the Circuit Court for Kent County appointed Mrs. Magness trustee for her husband's property. On November 22, 1945, Dr. Magness died.

On November 1, 1946, Aetna Life Insurance Company instituted this proceeding in the Circuit Court alleging that the aggregate sum of $8,000 was payable by the company under three policies issued on the life of Dr. Magness, but that conflicting claims thereto had been made by Lynn and Mrs. Magness. The company prayed the Court to order the two contesting claimants to interplead, and to authorize the company to pay the fund into court. On January 27, 1947, the Court passed a decree directing (1) that the parties interplead in the proceeding, with Stella F. Magness as plaintiff and Edward J. Lynn as defendant; (2) that the company retain $100 out of the fund of $8,000 as a fee for its solicitors for their services; and (3) that the company pay the balance of $7,900 to the clerk, whereupon its liability would be discharged. Mrs. Magness advanced two contentions: (1) that Dr. Magness was not mentally capable of making the changes of beneficiary, and (2) that Lynn agreed to pay the cash surrender values and the annual premiums in order to keep the policies in force solely for the benefit of Dr. Magness and herself, and not for his own personal benefit.

The chancellor was not thoroughly convinced that Dr. Magness was incompetent at the time of the changes of beneficiary, but he decided that the change in each policy was in the nature of a mortgage. Accordingly, the final decree passed on March 24, 1948, from which Lynn appealed, awarded him only $4,492.79, the total of the amounts which were paid to Dr. Magness and the company, with interest. The decree also directed the costs to be paid out of the fund, and the balance to be paid to Mrs. Magness.

There is no question, of course, that a change of beneficiary, to be given effect, must appear to have been made understandingly, and if it is shown that there was either lack of mental capacity or fraud or undue influence, the attempted change will be held inoperative. It is also accepted that the degree of mental capacity necessary to change the beneficiary in a life insurance policy is the

same as that necessary to execute a will or a valid deed or contract. *Wojtczuk v. Oleksik,* 168 Md. 522, 531, 178 A. 261. This Court has adopted the rule that the law presumes every man to be sane and to possess the requisite mental capacity to make a valid will or contract. *Brown v. Ward,* 53 Md. 376, 387, 36 Am. Rep. 422; *Davis v. Denny,* 94 Md. 390, 50 A. 1037; *Bell v. Wolfkill,* 152 Md. 407, 416, 137 A. 35. Testimony, in order to be legally sufficient to overthrow the presumption in favor of a person's sanity and capacity, must be directed to the date of the execution of his will or contract, and must tend to show that he was incompetent at that particular time. *Gesell v. Baugher,* 100 Md. 677, 682, 60 A. 481.

In the Court below Mrs. Lynn and also her brother, who is now a physician at Catonsville, testified about their father's peculiar conduct as far back as 1927. However, mere eccentricities, such as are found in people of ordinary sound mind, do not show lack of mental capacity. If the law were otherwise, as Chief Judge Bond observed in *Mecutchen v. Gigous,* 150 Md. 79, 87, 132 A. 425, 429, "then few wills could be sustained, for few testators can hope to pass their lives without odd actions and remarks at times * * *." Dr. Miller gave his opinion that there was "a screw loose somewhere," and that the condition was caused by alcohol and hardening of the arteries. But Mrs. Magness failed to adduce any evidence as to the mental condition of Dr. Magness on August 29, 1932. And it is significant that the doctor practiced medicine during 1932, 1933 and 1934. It is reasonable to believe that a man who can practice medicine would be able to comprehend the significance of a change of beneficiary in an insurance policy. Not only was there no evidence that Dr. Magness was under the influence of liquor on August 29, 1932, or that his mental condition at that time was such that he could not have made a valid deed or contract, but Lynn swore positively that the doctor was not intoxicated when the change was made but appeared normal at that time.

We accept the rule that the intoxication of a person which will invalidate a deed or contract made by him must be such as to render him incapable of knowing what he is doing, or to deprive him of the powers of reasoning and understanding to such an extent that he fails entirely to comprehend the consequences of his act. In order to set aside a person's contract on the ground of drunkenness, it is not sufficient to show that he was under undue excitement from the use of liquor. His incompetency can be established only by proof that at the time of the challenged act his understanding was clouded or his reason dethroned by actual intoxication. The mere showing that he had previously been intoxicated on numerous occasions is not sufficient. The temporary mental derangement produced by intoxication must be shown to have existed at the time of the transaction. *Van Wyck v. Brasher,* 81 N. Y. 260; *Wright v. Fisher,* 65 Mich. 275, 32 N. W. 605, 610, 8 Am. St. Rep. 886; *Fendler v. Roy,* 331 Mo. 1083, 58 S. W. 2d 459. If a man is so intoxicated that he is substantially *non compos mentis,* his contract will be held invalid; but if the intoxication is slight, equity will not interpose. The law does not gauge contractual competency by the standard of mental capacity possessed by reasonably prudent men. A man is not incapacitated because of intellectual limitations arising from intoxication which merely prevents him from giving to a proposed contract all the consideration that a reasonably prudent man would be able to give it. Indeed, the Court of Appeals of Kentucky has said: "Experience shows that a man may be very much intoxicated and still be shrewd, hard in driving a bargain, and in every way competent to manage his own business." *Glenn v. Martin,* 179 Ky. 295, 200 S. W. 456, 457.

On the other hand, equity will interpose in case of fraud or imposition. If there is any unfairness in a transaction, such as gross inadequacy of consideration, the court will consider the stupidity of the party in determining whether there was such imposition as will vitiate the transaction. *Colegate D. Owings' Case,* 1

Bland 370, 391, 17 Am. Dec. 311. To warrant an annulment of a contract because of partial intoxication, it must be shown either that the condition was produced by the act or connivance of the person against whom relief is sought, or that unfair advantage was taken of his situation. We reaffirm the rule stated in *Scheller v. Schindel*, 153 Md. 547, 582, 138 A. 415, that unless permanent incapacity of a party is shown to have existed prior to the execution of the contract under attack, the presumption of capacity at the time of execution must be overcome by evidence which affords a rational basis for an inference of incapacity at that particular time. In the Court below Dr. Miller admitted that Dr. Magness would recuperate from his drunks and "get all right and be fine as silk." We, therefore, agree that Mrs. Magness failed to sustain the burden of proof on the issue of incompetency.

However, we cannot accept the chancellor's finding that the change of beneficiary in each of the three policies was in the nature of a mortgage. Lynn testified definitely that he discussed the matter thoroughly with Dr. Magness in the presence of the Aetna agent, that the agent witnessed the doctor's signature on each request for change of beneficiary, and that he effected the desired changes and subsequently delivered the policies to Lynn in the presence of Dr. Magness. We have not overlooked the testimony of Mrs. Lynn that her husband told her several months later that he had taken over her father's insurance and "he would take care of all of us." This alleged assurance, however, was not only indefinite but also voluntary. On the other hand, Lynn's testimony is plain and definite. He gave the following version of the transaction: "I was upstairs and I had the check, and when Dr. Magruder came over I went downstairs and went in, and Dr. Magruder said, 'I have the policies.' I said, 'Let me see how you changed the beneficiary.' He had all three of them at that time. He showed them to me, and I asked Dr. Magness if he was satisfied, and he said, 'Yes,' and then I gave him the check in his office.

I went back upstairs and of course they gave me the policies."

Nor do we think that the evidence in this case is sufficient to warrant the imposition of a constructive trust. We recognize, of course, that whenever there is a fiduciary or confidential relation between two parties wherein trust and confidence are reposed on one side and influence and control are exercised on the other, a court of equity will prevent the weaker party from stripping himself of his property. *Williams v. Robinson,* 183 Md. 117, 36 A. 2d 547. We also agree that a confidential relation which may give rise to a constructive trust is not limited to cases of guardian and ward, attorney and client, and principal and agent, but exists whenever confidence is reposed by one person and accepted by the other. *Grimes v. Grimes,* 184 Md. 59, 40 A. 2d 58. But the evidence before us does not show that Dr. Magness reposed confidence in his son-in-law in business matters. At first, after his daughter's marriage, Dr. Magness refused to speak to him, but after nearly a year he finally softened, and invited him to dinner on Christmas Day. Thereafter the doctor grew fond of Lynn, and Lynn occasionaly drove him around on his calls to patients. This evidence is insufficient to cast the burden of proof upon Lynn, who was the primary beneficiary according to the policies, and who held the policies 15 years.

It is conceded that Aetna Life Insurance Company paid to Dr. Magness a total of approximately $9,600 in disability benefits under the three policies during the period from August, 1934, until his death in November, 1945. The record does not disclose any evidence of imposition. Lynn asserted that he discussed the transaction with Mrs. Magness, and that she never made any objection thereto or even asked to see the policies. When the case came on for trial more than a year after Lynn filed his answer, Mrs. Magness did not either appear or file a deposition.

In our judgment Mrs. Magness failed to sustain the burden of proving that she is entitled to a portion of the

life insurance payable under the policies. The decree of the chancellor must, therefore, be reversed.

> *Decree reversed and case remanded for the passage of a decree in accordance with this opinion, the costs to be paid out of the fund.*

MARKELL, J., delivered the following dissenting opinion.

I agree with Judge Smith's decision and his opinion. The printed record supports, as a conservative statement of Dr. Magness's physical and mental deterioration in 1932 when the changes of beneficiaries were made, Judge Smith's opinion after hearing the evidence and seeing the witnesses, viz.:

"I get the impression from hearing the evidence in this case that the situation which existed at the time when the change of beneficiary was made was this: That Doctor Magness was drinking heavily; he was neglecting his practice, and he was in financial difficulties, and I believe that those circumstances gave the members of his family a great deal of worry and concern about his future and their future. And, as a result of his course of life and professional activity, it became necessary for the family to draw on a savings account, and ultimately necessary to try to realize some money on insurance policies just in order to get along.

"Now I believe there was a discussion in the family about how to go about that, and the proposition discussed was how that insurance could be saved for the benefit of the family. Now Mr. Lynn was not approached on that subject as a stranger. He was a member of the family. He was the husband of Doctor Magness' daughter, and if he had not been he never would have entered into this transaction. Doctor Magness did not approach any stranger with a proposition to sell his insurance policies, or cash them in, or anything of that kind, but he did want to raise some money, and Mr. Lynn agreed to put up some money to try to save for Doctor and Mrs.

686

Magness the benefit of these insurance policies.

"I, perhaps, cannot find with that degree of certainty that ought to be required as to any business transactions at the particular time when Doctor Magness executed these changes of beneficiary that he was of unsound mind, did not know what he was doing, did not know the legal effect of the transaction, and did not understand it, so that they ought to be struck aside altogether, but I am convinced from the evidence that he was on the borderline of that condition. He was drinking quite heavily, and for a part of the time he was incompetent due to his indulgence of his craving for liquor, and he was not altogether in posession of the full command and use of his faculties—certainly not at all times. Now, under those circumstances, an arrangement was made the purpose of which was to try to save for the family the benefit of the insurance policies, and Mr. Lynn put up the money. I cannot persuade myself that if Doctor Magness had died right after that Mr. Lynn would have claimed the full death benefits under these policies. I think that the testimony of the parties as to the transaction, which is now some years ago, is affected by the fact that in 1942 a separation between Mr. Lynn and his wife occurred, so that now Mr. Lynn is outside the family, whereas, at the time, he was inside the family.

"Therefore, I will put it this way, that I feel that this transaction at the time when it occurred and under the circumstances in which it occurred, is not one which a court of equity should approve as an outright sale of these insurance policies, but that it ought to be set aside, and I believe that the real purpose of the transaction, which appeared to be an outright change of beneficiary, was, in fact, in all of its essentials, a mortgage, and it would follow that the disposition of the money which has been paid into court ought to be about an equal division of it between the parties, that is to say, that Mr. Lynn ought to recover every penny he has advanced, with legal interest to the date of the interpleader decree, and the

remainder of the money, less the cost, etc., be directed to be paid to the other party, Mrs. Stella L. Magness."

Even in the absence of fiduciary relations, the mere fact that a drunkard is "temporarily sober" and not of unsound mind (or even "on the borderline of that condition") is not sufficient to sustain a transaction with him. *Kendall v. Ewart*, 259 U. S. 139, 146, 147, 42 S. Ct. 444, 66 L. Ed. 862. Far less is it sufficient to sustain the burden of proving the fairness of a transaction with him by one who occupies a fiduciary relation toward him. Appellant occupied such a relation to Dr. Magness. As Judge Smith says, appellant was approached, on the subject of "saving the insurance for the benefit of the family," not "as a stranger", but as "a member of the family". The only purpose of approaching him was, not to enable him to get the insurance from the family, but to save it for the family. If "family" needs any explanation, Mrs. Magness was sole beneficiary in one policy and life beneficiary in the other two, with remainder to the son and daughter. The fact (if it be a fact) that before the first insurance transaction Dr. Magness may not have "reposed confidence" in appellant "in business matters" is immaterial; appellant, however, says the only reason he lived in Dr. Magness's house was that it cost him less rent than it would have cost to live elsewhere, and also says Dr. Magness "discussed his financial affairs with" appellant. The doctrine of confidential relations applies no less to a first transaction than to subsequent ones.

Of course, (*a*) a contract that was fair when it was made would not become unfair upon the separation between appellant and his wife and (*b*) unfairness of a contract relating to insurance is not shown merely by the event in a particular case. It is, however, reasonable to conclude, as Judge Smith does, that if Dr. Magness had died promptly, before the separation between appellant and his wife, appellant would not have claimed the pound of flesh which he now says was nominated in the bond, and that appellant's present claim was not the true understanding between him and Dr. Magness. There was

no written contract between them. The written changes of beneficiaries imposed no obligation whatever upon appellant, though he testifies that he agreed to keep the policies in force until Dr. Magness became disabled or died, by paying premiums aggregating $341.75 per annum, including $21.73 for disability insurance. As between Dr. Magness and appellant, these writings are consistent with either an intention to make an absolute sale or an intention to give security for money advanced. *Cf. Thomas v. Klemm,* 185 Md. 136, 43 A. 2d 193.

Appellant advanced $1771.74, the "cash surrender value" at the time, for $8000 life insurance. He paid $656.83 for premiums. If he gets the full amount of the policies, he will get back all he paid, plus interest at 6 per cent, plus a profit of about 144 per cent. If this were an unexpected windfall, due to the uncertainties of life and death, it might not show that his alleged bargain was unfair. But it was not an unexpected windfall. This profit, exorbitant as it is, is not more, but less, than was reasonably to be expected in 1932 when appellant took over the insurance. The "cash surrender value" of a life insurance policy represents the difference between the life expectancy, predetermined from mathematical averages of experience, of a man in good health at his age when a policy is issued, and his lessened expectancy, in continued good health at each successive subsequent age. Dr. Magness's policies were issued in 1920 and 1924, when he was in good health, at the ages of 43 and 46 respectively. Appellant was made beneficiary in 1932, when Dr. Magness was 54 and in anything but good health and his life expectancy was consequently far below average. In other words, appellant claims to have bought insurance on an uninsurable risk at the price an insurance company would have charged for insurance on a good risk. Only by some gross fraud could such insurance on Dr. Magness have been obtained in 1932 from an insurance company. Appellant's alleged purchase was as unfair as a sale of bad eggs for the price of good.

In 1932 a purchaser of Dr. Magness's policies would incur two possible pecuniary risks, (1) the risk of continued payment of premiums by reason of failure of Dr. Magness to become permanently disabled before reaching the age of 60, and (2) the risk of delay in maturity of the policies through unexpectedly long life of Dr. Magness.

The first of these risks, normally the major risk, was in this case nominal and nonexistent. In 1932 Dr. Magness was actually totally incapable of practising medicine and unfit to prey on the public by pretending to practice. As appellant testifies, "he was throwing away his practice by drinking"; "his finances had gone down to the point where he could not even pay the light bills." What was left of his so-called practice was a sort of medical brokerage, which consisted of accompanying other physicians who saw his patients and gave them medical attention, which he himself was unfit to give. Dr. Miller, one of these physicians, saw patients with him 88 times in 1932, and he was sober only three times; he was incapable of carrying on his profession, that is why Dr. Miller helped him. Appellant says, of his condition *after* the first insurance transaction; "Well, he was all right. Q. Did he appear normal to you? A. Naturally; he was not intoxicated, but I have seen him intoxicated on other occasions". As to his condition on the day of the second insurance transaction, appellant says, "It was all right, as far as I know. I am not a doctor. He was not drinking very much. He was not drunk". Neither of these transactions occurred on one of those rare occasions when he was "temporarily sober" or "fine as silk."

The second risk, as has been said, was far below average by reason of Dr. Magness's physical condition. For three years he had been drinking himself to death and, through drink or otherwise, had developed a complication of fatal diseases and conditions, including chronic Bright's disease, cerebral arterioscelerosis, high blood pressure (always over 200) and myocarditis, which offered a purchaser of post-obits a good prospect of his early death. The unexpected event is, not that he died as soon, but

690

that he lived as long, as he did. Any "loan shark" who knew his condition in 1932, as appellant and the rest of his family must have known it, would have jumped at an opportunity to make the bargain appellant says he made.

Whether the bargain between appellant and Dr. Magness be regarded as security for an advance, and enforced as such, or as a sale, and set aside as unfair, the result is the same. Appellant should get his money back with interest at 6 per cent—and no more. Judge Smith's opinion, and the printed record, sustain either view.