HELEN P. TRACY,

*vs.*

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation, SARA A. BELL, also known as SARA ANN BELL, and WILLIAM M. TRACY, JR.

*New Castle, December 11, 1953.*

208

*Joseph Donald Craven,* and *J. D. Winslow,* Wilmington, for plaintiff.

*James L. Latchum* of Berl, Potter & Anderson, Wilmington, for defendant Prudential Ins. Co.

*Thomas Herlihy, Jr.,* and *Morris Cohen,* Wilmington, for defendant Sara Ann Bell.

*Robert B. Walls, Jr.,* Wilmington, for defendant William M. Tracy, Jr.

SEITZ, Chancellor: By this action plaintiff, the insured's widow, seeks to have this court void action taken by the deceased-insured, William M. Tracy, Sr. (sometimes called the "insured" or the "deceased"), removing plaintiff as the beneficiary of his life insurance policy and substituting the defendants, Sara Ann Bell and William M. Tracy, Jr. (sometimes called "William, Jr."). Plaintiff claims that at the time the insured applied for the change of beneficiaries he was either:

1. Of unsound mind generally.

2. Suffering from an insane delusion which caused him to make the change in the policy.

3. Subject to the undue influence of the defendant, Sara A. Bell, who persuaded him to change the beneficiaries.

Defendants deny plaintiff's contentions and also claim that the plaintiff is guilty of unclean hands.

The deceased had been married twice prior to his marriage to the plaintiff. The minor defendant, William Tracy, Jr., was his child by his second wife and was born in 1942 or 1943. The deceased married plaintiff on June 25, 1946. On November 17, 1947 he became the insured on a policy of insurance issued by the defendant, The Prudential Insurance Company of America. The plaintiff, Helen Tracy, the insured's wife, was the primary beneficiary. The secondary beneficiary was the minor defendant, William M. Tracy, Jr.

In 1949 they moved to a farm near Earleville, Maryland. In April 1950 a child named John Barnes Tracy was born to plaintiff and the insured. On February 3, 1952 the deceased and his wife separated. On February 4, 1952 the deceased executed a will in the office of Charles M. Huester, an attorney in Elkton, Maryland. By this will he left one-half of his estate to plaintiff with the statement "knowing that she will provide for my son, John Barnes Tracy". In the event she predeceased him it was to go to John. He purported to appoint his friends (Leroy and Elizabeth Downes) as guardians for his son William, Jr. The other half of his estate went to the Downes and his son, William, in equal shares. On February 13, 1952 a separation agreement prepared by Mr. Huester was signed by the parties.

Some time in November 1951 the deceased had become acquainted with the defendant, Sara Ann Bell, through a mutual acquaintance. In March of 1952, at the request of the deceased, Mrs. Bell went to the Tracy farm near Earleville, Maryland, as housekeeper. In April of 1952 the deceased applied for reinstatement of his policy which had lapsed on March 19, 1952 for nonpayment of premiums. He also, by a form dated April 21, 1952, changed the beneficiary from Helen Tracy to William M. Tracy, Jr., and Sara Ann Bell.

In October of 1952 the deceased, while on his way to Lewes to see his father who was seriously ill, was killed in an automobile accident. He was about 35 years of age at the time.

The insurance policy with a base amount of $10,000 contained a double indemnity clause for accidental death. Thus the beneficiaries became entitled to $20,000. With certain proper adjustments, the money was deposited with the court by Prudential and is now subject to this court's decision.

It appears that John Barnes Tracy today is receiving $48.70 per month from the Railroad Retirement Board.

At the outset, certain principles of law must be stated as the standard by which the evidence is to be evaluated. First, it appears that the change of beneficiary transaction took place in Maryland while the deceased resided there. However, no attempt was made to prove the Maryland law and I will therefore assume that it would be the same as the Delaware law. The parties have apparently adopted this approach.

The courts generally conclude that the law governing the mental capacity sufficient to execute a will applies to insurance cases. In 2 *Appleman, Insurance Law and Practice* § 1024 it is said:

> "Mental capacity. It requires the same degree of mental capacity to make a valid change of beneficiary as it takes to make a will, and any derangement of mind must exist when the change is made."

See also *Wojtczuk v. Oleksik,* 168 *Md.* 522, 178 *A.* 261; *Lynn v. Magness,* 191 *Md.* 674, 62 *A.2d* 604. I adopt this rule as the Delaware law applicable to this aspect of the case.

The Delaware rule concerning testamentary capacity was well stated in *Rodney v. Burton,* 4 *Boyce* 171, 86 *A.* 826, 828:

> "* * * Every person is presumed in law to be of sound mind until the contrary is shown, and the burden of showing an unsound mind in the testatrix to the satisfaction of the jury by competent evidence rests on the party contesting the validity of the will, and the testimony must relate to the time of its execution.

\*    \*    \*

"The question is not so much as to the degree of mind or memory possessed by the testatrix, as this: Had she sufficient mind and memory? Had she a disposing mind and memory? Was she capable of recollecting what property she was disposing of, and to whom she was disposing of it? In a word, were her mind and memory sufficiently sound to enable her to know, and understand, the business in which she was engaged, at the time when she executed her will? Jamison v. Jamison's Will, 3 Houst. 108.

"If the jury are of the opinion from the evidence that the testatrix was capable, at the time she executed her will, of exercising thought, and judgment and reflection—if she knew how she was disposing of her property—what she was about, and had memory and judgment, her will cannot be invalidated. Chandler v. Ferris, 1 Har. 454; Lodge v. Lodge's Will, 2 Houst. 418."

I first consider plaintiff's contention that William M. Tracy, Sr., the insured, was of unsound mind generally on April 21, 1952 when he designated Sara Ann Bell and William M. Tracy, Jr., as the beneficiaries of his insurance policy and removed his wife's name from the policy.

It is difficult to separate the evidence relating to plaintiff's contention that the deceased was of unsound mind generally at the time from her second contention that he was suffering from an insane delusion. Moreover, the court was presented with a voluminous record covering the whole life of the deceased.

It is no easy task to attempt to set forth succinctly the elaborate testimony concerning the mental condition of the deceased. Plaintiff, in her brief, relies upon the testimony of ten of her witnesses. Elaborate testimony was taken from the mother and the sister of the deceased. Both testified in effect that they thought he was insane. His wife, his business partner at one time, two of his neighbors, a close friend, and a doctor who was the family physician for a time, all in one way or another testified that the deceased was mentally unsound. They gave various reasons for their conclusions which tended

to show that at various times he did such things as strike his fist against a hard object, say that God told him to shoot a gun out the window, shoot a hole in the wall, have crying spells and blackouts and complain of pains in his head, threaten to commit suicide, threaten to kill his wife, and charge that his wife married him for his money or his insurance although he was in debt.

Although it is treated more specifically under plaintiff's second contention that the deceased suffered from an insane delusion, nevertheless, it is also pertinent to this issue that the deceased told many witnesses that he was not the father of the plaintiff's child, John Barnes Tracy. He asserted that various men fathered the child. He also suggested that the family dog might be the father.

On the other hand there was substantial testimony to the effect that the deceased was neurotic but not psychotic; that he was highly nervous and temperamental but was not sufficiently disoriented to be considered mentally unsound. It seems to me that the easiest way to resolve the problem is for the court to set forth its evaluation of the man during the general period covered by the testimony.

The deceased was apparently, from childhood, a rather unstable person who was very stubborn. His first two marriages ended in divorce, but it is not possible from the record to evaluate his connection with the marital breakups. He served some three years in the second World War and participated in several of the heavy battles in the European theatre and was honorably discharged in the fall of 1945. He then resumed work with the Pennsylvania Railroad and in June 1946 married the plaintiff. The relationship between the deceased and the plaintiff between the time of the marriage in 1946 and their separation in 1952, was far from a happy one.

There can be no doubt that the deceased drank to excess and a great many of the remarks which the plaintiff's witnesses relied upon to justify their conclusion that he was insane are explainable as the utterances of an intoxicated person. The relationship between the deceased and the plaintiff apparently turned much worse from the date when the plaintiff told the deceased that she was pregnant. From that time on the deceased apparently felt that he and his child by

the prior marriage were secondary to plaintiff's concern for her own child. In any event, almost immediately the deceased commenced suggesting that someone other than himself was the father of the child. Substantial evidence was introduced by plaintiffs to show plaintiff's reputation for chastity, while defendants sought to show that the deceased had some basis for his charge. This specific point will be resolved in connection with the discussion of plaintiff's second contention. However, there can be no doubt that this was one of the factors which formed the basis for the consistent strife between plaintiff and the deceased.

Prior to his separation from plaintiff the deceased drank a great deal. There is some doubt as to how much he drank afterwards. When he was promoted to a position of passenger conductor on the Pennsylvania Railroad in 1947 he was drinking heavily. In 1951 the deceased was attempting to raise pop corn on the farm and work on the railroad as well. As a result of the deceased's inherent nervous temperament, his marital difficulties and his drinking habits, he reached the stage where on numerous occasions he cried and shook uncontrollably. On July 20, 1951 the deceased voluntarily went to the Perry Point Hospital as a patient and remained there until September 5, 1951. He was there examined, diagnosed and treated as suffering from "anxiety-reaction". The psychiatrist who made the evaluation in the report testified that the deceased was not psychotic. After his release from the hospital the deceased was examined in September of 1951 by the medical doctor and the psychiatrist for the Pennsylvania Railroad in the light of his prior confinement at Perry Point, and was pronounced fit to return to duty, which he did shortly thereafter.

The deceased and the plaintiff continued to live together on the farm in Earleville, Maryland, until February 3, 1952 when the deceased and the plaintiff had a violent quarrel at the home of the parents of the deceased in Lewes, Delaware. Without dwelling on an apparent inconsistency in plaintiff's testimony, I think it fair to say that plaintiff then and there made it clear that she was no longer going to live with her husband. Nor can there be any doubt that the deceased considered that they had parted. It was only the next

day that the deceased executed a will reciting that he was leaving half of his estate to the plaintiff with the statement therein "knowing that she will provide for my son John Barnes Tracy". On February 13, 1952 plaintiff and the deceased executed a separation agreement and there is no doubt in my mind that the parties had definitely and consciously decided that the marriage was finished. The agreement provided for support payments for and visitation rights with John Barnes Tracy.

In March of 1952 the defendant, Mrs. Bell, became the housekeeper at the Tracy farm. Whether she was anything more than a housekeeper, I will decide in connection with plaintiff's third contention.

In April of 1952 the agent for the Prudential contacted the deceased with respect to a reinstatement of his insurance policy which had lapsed. The deceased asked for and received a change of beneficiary form which he executed on April 21, 1952 changing the beneficiary from plaintiff to the two individual defendants, viz., his son by his second marriage, William Tracy, Jr., and his housekeeper, Mrs. Bell, listed as a "friend". In the application he stated the reason for the change as "separation". The insurance agent testified that the deceased told him he was changing the beneficiary because he was separated from his wife. The agent also testified that in his opinion the deceased was competent at the time. At or about the same time the insurance company requested the deceased to be examined in connection with his application for reinstatement. The examining physician was directed particularly to consider the mental condition of the deceased in the light of his prior treatment at Perry Point. The examining physician concluded that the deceased was a proper risk and was not incompetent. This evidence is particularly important because it is almost entirely documentary and relates to almost the exact period of time involved in plaintiff's charge that the deceased was incompetent. Moreover, the documents were made at a time when there was no dispute as to the mental condition of the deceased.

During this period the deceased also worked on the railroad and the farm, although it is true that he was somewhat less than a steady

worker. He executed certain notes to secure loans to finance the farm work and purchased a car. He also engaged in certain other commercial transactions, even with one of plaintiff's "strongest" witnesses. In fact, some of plaintiff's witnesses were driven to testify that in their opinion he was "insane" at the time in 1947 when the policy was originally taken out.

All the finder of fact can do is to try to synthesize the various statements in an attempt to arrive at his best judgment as to the mental condition of the deceased on April 21, 1952 when he changed beneficiaries. The evaluation of the mental condition of the deceased made by several qualified doctors at a time when they were not subject to the stress and strain of court proceedings is particularly impressive. They found him competent. While the testimony of the family physician that he believed the deceased insane is entitled to some consideration, I did not find it so impressive as that of those particularly trained in psychiatry. Moreover, the attorney for the insured prepared agreements for him and had no doubt about his sanity. He engaged in many business transactions during the period of his alleged insanity and when sober talked and acted sensibly even in the opinion of some of plaintiff's witnesses. He also worked both on the railroad and the farm during this period.

The cumulative effect of the evidence leads me to conclude that he was competent at the time of the change of beneficiary.

Plaintiff's second contention is that at the time he executed the change of beneficiary the deceased was suffering from an insane delusion that plaintiff was unfaithful and his son, John Barnes Tracy, illegitimate, and that these delusions were the reason the deceased removed plaintiff's name from his insurance policy.

The case of *Rodney v. Burton, supra* [4 *Boyce* 171, 86 *A.* 830], recognized the legal principle contended for by plaintiff in the following language:

> "We think the law respecting delusions is well settled. It was very clearly and tersely expressed by the court when they said, in the Duffield case [Duffield v. Morris' Ex'r, 2 Har. 375,

379] : 'Partial insanity, meaning insane delusion, will avail to defeat a will which is the direct offspring of such partial insanity or insane delusion.' "

There are two important factual issues involved in plaintiff's contention:

1. Was the belief of the deceased a mere false idea as distinguished from an insane delusion?

2. Assuming such a delusion, did the deceased change the beneficiaries of his policy because of that belief?

Plaintiff relies upon evidence which clearly shows the insured's hostility toward his wife over a long period of time. It is also clear that he told many people he felt that his wife was unfaithful and his son illegitimate. Indeed, he told the doctor at Perry Point of his hostility toward his wife and claimed that she was sexually unresponsive and that he felt she was unfaithful although he admitted that he had no proof. In fact he apparently tried at one stage to fabricate evidence of his wife's unfaithfulness.

The deceased also told many people that he was not the father of the younger child, John Barnes Tracy. He suggested that various men were guilty. He also said the family dog would be the father if he had red hair. The statement concerning the dog I pass over because, against the background of this case, I believe it was the statement of a drinking person who developed such a dislike for his wife that he would say almost anything to her or about her which he thought would degrade her. This was "in keeping" with his growing hostility toward his wife which may be explained in part by what appears to have been a case of sexual incompatibility. When this is considered in conjunction with his neurotic disposition and drinking habits, it helps to explain if not excuse his conduct toward plaintiff.

Defendants point out that the deceased apparently based his suspicion of his wife's unfaithfulness on such things as the statement of William, Jr., that a certain man visited the Tracy home in the absence

of the deceased and on such occasions the plaintiff would send William, Jr., out of the house, presumably to get rid of him. There was also some other fragmentary evidence which was relied upon as tending to show that the deceased was justified in his assertion that plaintiff was unfaithful. I am inclined to agree that the attitude of the deceased on this point was best expressed by the deceased himself to the doctor at Perry Point when he said that he was under the impression that his wife was unfaithful "although he admits that he has no proof of this". There is no reasonable basis to conclude from the testimony that the plaintiff was unfaithful and the child not his. In so far as the testimony is concerned, she appears to have been a good and faithful wife. However, it should be noted that immediately before his death the deceased instructed his attorney to commence divorce proceedings against the plaintiff.

While the evidence which defendants adduced on this point was scanty indeed, nevertheless, the court cannot conclude that the deceased was suffering from a delusion. The difficulty of applying the insane delusion rule to this type of case is pointed out in 1 *Page on Wills, (Lifetime Ed.)* § 146, in the following words:

> "A common type of insane delusion is the testator's belief, not based on any evidence, that his wife is unfaithful to him, and that her children are not his own, as a result of which he executes a will disinheriting them. If, however, such a belief is based upon evidence, even though slight and insufficient, the belief, although erroneous, is not an insane delusion. * * *

> "The practical difficulty in applying this rule is that the testator is dead, and that it is impossible to know on what evidence he based his belief. As a result, an insane delusion may be found to exist although testator might have been able to show the existence of evidence on which he based his belief. * * *

> "The fact that testator dislikes certain of the natural objects of his bounty does not establish an insane delusion; even if such dislike is groundless; and still less if such dislike is based upon some reason, although it may be an unjust one. * * *"

It is important to realize that the deceased himself recognized that he did not have proof. Therefore, although the evidence does not show what the court would consider a reasonable foundation for his apparent belief, that does not necessarily mean that the deceased was suffering from an insane delusion. See *In re Will of Barnes*, 2 *Terry* 206, 18 *A.2d* 433; 2 *Appleman, Insurance Law and Practice*, § 1024. The authorities cited by plaintiff do not hold to the contrary. See 2 *Black on Rescission and Cancellation, (2d. Ed.)* § 266.

Therefore, while it is apparent that this court can say on the basis of the record that plaintiff was a good and faithful wife and that there is no reason to doubt that the deceased was the father of her child, nevertheless, I am not persuaded that this court can fairly say that the beliefs expressed by the deceased demonstrated under the circumstances that he was suffering from an insane delusion with respect to such matters.

There is another factual infirmity in plaintiff's second contention. I conclude that the change of beneficiary was not the direct consequence of the deceased's belief that plaintiff was unfaithful and the child illegitimate.

The will executed by the deceased the day after the separation refers to John Barnes Tracy as "my son". Moreover, he inserted a provision for visitation rights in the separation agreement in which he agreed to support the boy. Moreover, he visited the boy on many occasions after the separation and apparently was fond of him. Moreover, he told the insurance agent that he was changing beneficiaries because "His wife had taken the baby and walked out on him".

The evidence shows that the deceased was primarily "looking after" his older child by the change of beneficiaries. Also, whether we approve it or not, he apparently believed that the newly acquired housekeeper, Mrs. Bell, was entitled to consideration because of what he considered to be her fine treatment of William, Jr., and the deceased. It must be remembered that the deceased had no reason to believe he was going to die accidentally so soon after the change of beneficiary was made. Thus the fact that the double indemnity feature of the policy came into operation tends to distort the picture. The

deceased was primarily concerned with William, Jr., who was also not well and who, after the separation, was the responsibility of the deceased alone. He thought that he was providing in his will for the other child, John Barnes Tracy. We must also assume that he knew that in the event of his death John Barnes Tracy would receive monthly payments from the Railroad Retirement Fund.

■ Certainly the actions of the deceased were not in accordance with standards which one might wish for in marital relations. Yet, courts must be slow to invalidate legally permissible transactions for that reason alone. If the court may be permitted to philosophize, I would say that deviation from "normal" is "normal". It is only when the deviation is too pronounced or too persistent that the court will characterize it as the action of a mentally ill person, and thus invalidate certain of his transactions.

■■ The testimony fails to satisfy me that the deceased was suffering from an insane delusion with respect to his wife's unfaithfulness and his child's illegitimacy. But even assuming that my finding is factually unsound, I further find that the basic reason for the change of beneficiary was premised not upon those "beliefs" but upon the fact that his wife had left him and the housekeeper had "taken over" at a time when there was no one to look after the older child.

Plaintiff's third contention is that the defendant, Mrs. Bell, used undue influence to have the deceased change the beneficiaries.

■■ Plaintiff says the undue influence arose from the meretricious and confidential relationship existing at the time between the deceased and Mrs. Bell. I think it fair to infer that a meretricious relationship did exist at the time of the application to change beneficiaries. Plaintiff asks me to follow those cases which raise a presumption of undue influence where such a relationship is shown to exist. However, I prefer the majority view that the existence of a meretricious relationship between the insured and the beneficiary in and of itself does not raise a presumption that undue influence was exercised. Compare *Goodale v. Wilson,* 134 *Me.* 358, 186 *A.* 876; 66 *A.L.R., p.* 243. The reason for the minority rule seems to be that it should be made as difficult as possible for the party "living in

sin" to benefit from that status. Since gifts to such persons are not banned by our law, I think the ends of morality are sufficiently served by considering the meretricious relationship as a fact along with the other evidence in resolving the issue of undue influence in fact. I so hold here.

█ I thus approach the plaintiff's contention of undue influence without any presumption in plaintiff's favor. Plaintiff says the mental and physical condition of the deceased was such that he was peculiarly susceptible to the machinations of the defendant, Mrs. Bell. She relies upon the doctor's testimony that the deceased had great "dependency needs". She also points to testimony tending to show the irrational behavior of the deceased, but once again I think much of it can be accounted for by his drinking habits. She also calls attention to some very fragmentary testimony tending to show that Mrs. Bell could do more with him than anyone else. I found this evidence of little value.

Based on the best reading I can give all the evidence, I am unable to find that the defendant, Mrs. Bell, exercised undue influence on the deceased at the time he changed beneficiaries. At that time he expressed the reasons for the change quite rationally to the insurance agent. At that time he had only known Mrs. Bell a few months and while conditions appear to have improved during her tenure, I cannot infer from the evidence that she had an undue "influence" over this strange man when he made the change of beneficiaries. Plaintiff points to the fact that Mrs. Bell did not testify in her own behalf. Nevertheless, she was called as a witness by plaintiff. Nor do I find the "writing off" of the wife for the "stranger" unnatural under the circumstances.

There is also a dispute as to whether or not Mrs. Bell even knew of the change of beneficiaries prior to the insured's death. This is a difficult factual dispute to resolve. On the best reading I can give the testimony on this point I am not satisfied that she did know that she was such a beneficiary. This being so, this is another important fact tending to support my conclusion that she did not exercise undue influence at the crucial date with respect to the change.

I therefore conclude that plaintiff has failed to sustain the burden of showing that the defendant, Mrs. Bell, exercised undue influence over the deceased in connection with the change of beneficiaries.

In view of my conclusions it becomes unnecessary to consider the defendant's claim that the plaintiff was guilty of unclean hands.

It follows that plaintiff is not entitled to relief and the money now on deposit in this court should be disbursed in accordance with the change of beneficiary form executed by the deceased.

Order on notice.