# STANSBURY *v.* STATE

[No. 43, September Term, 1958.]

*Decided November 20, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-

son, Hammond and Horney, JJ., and Henry, J., Chief Judge of the First Judicial Circuit, specially assigned.

*Stanley Scherr* and *John C. Griffin* for the appellant.

*Joseph S. Kaufman, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, J. Harold Grady, State's Attorney for Baltimore City,* and *Edward Borgerding, Assistant State's Attorney,* on the brief, for the appellee.

Henderson, J., delivered the opinion of the Court.

The appellant was indicted for murder, along with James Donald Fitzgerald and Marvin Rich. The other defendants were granted a severance. The appellant was tried before two judges, without a jury, found guilty of murder in the first degree, and sentenced to death. He contends that the evidence did not support a verdict of murder in the first degree; that it showed he was too intoxicated to form an intent to rob or to kill in the course of a robbery; and that the court erred in finding him sane and in failing to grant a continuance until after trial of the co-defendants.

The killing occurred a few minutes after 2 A.M. on the morning of January 16, 1958. The appellant and Fitzgerald entered the Coronet Bar, St. Paul Street and Mount Vernon Place, Baltimore, shortly before closing time, and ordered beers. After the other patrons left at 2 A.M., Sliger, the bartender, asked them to leave and walked to the door with them, with the keys in his hand. The appellant pulled out a .38 caliber revolver and said to Sliger: "This is a holdup, mister, please don't do anything rash and everything will be O.K." He ordered Sliger to walk to the end of the bar and empty the cash register. Sliger made a move away from the bar, and the appellant grabbed Sliger's arm and said: "Don't go that way, go back." Sliger, according to the appellant's version, either kicked the appellant, or kicked at him, and as a result the appellant was thrown off balance and the gun was fired. Sliger was shot in the left side of the chest and died almost instantly.

John Gorham, a porter in the bar, ran to the cash register and put the drawer on the bar. The appellant pointed the gun at Gorham, or in his direction, instructed Fitzgerald to get the money, and said: "Let's get out of here." Fitzgerald scooped the cash and other contents from the drawer, and they left. They were seen running up St. Paul Street and entering a parked car. The witness took down the license number, and the police stopped the car at 21st Street. A .38 caliber revolver was found in the appellant's coat, with one spent cartridge. It was admitted that this weapon fired the shot that killed Sliger. Recovered from Fitzgerald were $49.57 in cash, and cash register tapes. Officer Drexel testified that at the time of his arrest, the appellant was "very excited" but "didn't seem like he was drunk". The officer did not notice any smell of alcohol.

Examination of Sliger's clothing revealed no powder marks. There was testimony, based on tests of the murder weapon, that powder patterns showed on shots made within three feet of a target, but none beyond three feet. It was concluded that the shot that killed Sliger had been fired from a distance of more than three feet. There was also testimony that a three pound pull upon the trigger was necessary to discharge the weapon.

Stansbury gave three separate confessions to the police. Two were signed and admitted into evidence without objection; the third was unsigned. He made statements in the presence of three officers admitting the shooting and robbery. In addition, he took the stand and admitted that he had pulled his gun on Sliger, told him it was a holdup, and ordered him to empty the till. He testified, however, that Sliger kicked him, "I was walking pretty close * * * when that gun went off I was trying to throw the gun to the right and up away from where Mr. Sliger was." He didn't know what made the gun go off, "my finger was not on the trigger."

The appellant testified that he had been unemployed for two months prior to the killing and had been living with Fitzgerald. He and Fitzgerald had been drinking for several days. On the evening in question Rich came to Fitzgerald's apartment for the purpose of learning how to obtain money

from homosexuals. The appellant went out with Rich on this venture, which proved to be unsuccessful. Later, he stole an automobile, because he decided he wanted to go to Florida. Fitzgerald, Rich, and the appellant drove to the York Road section, and then downtown. They stopped at the Coronet Bar but did not go in, as it was crowded. They stopped at his mother's house to pick up cigarettes and his younger brother joined them. They then drove to northeast Baltimore, making several stops to buy pint or half pint bottles of vodka. The appellant had a revolver in his inside coat pocket. He testified at various times that he had bought it, that he had stolen it, and that it belonged to Fitzgerald's father. He testified there was no discussion of a holdup; the last stop at the Coronet Bar was to buy more vodka. Some time after his arrest, he tried to kill himself with a razor blade, and was put under restraint in a hospital. He did not know why he took his gun out, "something just told me, hold him up, so I did." He was in the doorway at the time. He testified that the shooting was an accident.

In cross-examination he admitted to a long series of convictions, including breaking and entering, larceny, and larceny of automobiles. He admitted that he and Fitzgerald had discussed holdups earlier in the evening. "I asked James about, if he were a couple of hundred miles away from home, on the road, and needed some money and were going to hold up a place just what he would do." James did not know he had the gun in his pocket, and there was no prior discussion about holding up the Coronet Bar.

The appellant argues that the robbery was an impulsive, unplanned act, and that the revolver was discharged accidentally, although he concedes that Sliger was shot in the perpetration of a robbery. Code (1957), Art. 27, sec. 407 provides that "All murder which shall be perpetrated by means of * * * any kind of wilful, deliberate and premeditated killing shall be murder in the first degree." Sec. 410 provides that "All murder which shall be committed in the perpetration of, or attempt to perpetrate, any * * * robbery * * * shall be murder in the first degree." Sec. 411 provides that "All other kinds of murder shall be deemed murder in

the second degree." The appellant contends that a killing in perpetration of a robbery is not necessarily murder. To be murder a killing must be with deliberate intent or design, without legal justification or excuse, and under circumstances which are insufficient to reduce the crime to manslaughter. He argues that the evidence did not show the requisite intent to establish murder in any degree, and that the only effect of sec. 410 is to elevate murder in perpetration of a robbery to the first degree, in substitution for the prerequisite, under sec. 407, that it be wilful, deliberate and premeditated. We think there are several answers to this contention.

We have held that the quoted sections do not create any new crime, but merely classify murder, as it was known at common law, into degrees. *Wood v. State,* 191 Md. 658, 666; *Abbott v. State,* 188 Md. 310, 312; *Davis v. State,* 39 Md. 355, 374. At common law, a killing in the perpetration of a robbery was murder, regardless of intent. See Clark and Marshall, *Crimes* (4th ed.), sec. 245. As used in the statute, the "common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed." *Davis v. State, supra.* It is perfectly clear that a finding either that the killing was wilful, deliberate and premeditated, or that it was in perpetration of a robbery, would support a verdict of first degree murder. Cf. *Kier v. State,* 216 Md. 513, 522. See also *Thomas v. State,* 206 Md. 575, 581, where it was said that it is unnecessary to show "malice" when the killing occurs in the course of a robbery.

The distinction between murder and manslaughter is that in the former there must be malice aforethought. *Faulcon v. State,* 211 Md. 249, 257. But since malice may be express or implied, an inference of malice may be drawn from the circumstances, of which the robbery is one. It has been said that the inference of malice may be drawn from the fact of the use of a deadly weapon directed at a vital part of the body. Cf. *Chisley v. State,* 202 Md. 87, 105; *Davis v. State,* 204 Md. 44, 51. See also note, 13 Md. L. Rev. 327. The inference is strengthened when the weapon is used for the purpose of robbery. Here the intent to rob, and the implied

threat to kill, are at least enough to support a finding of murder, regardless of the fact that there is evidence that there was no actual intention to discharge the weapon, or that its discharge was accidental. See *Daniels v. State,* 213 Md. 90, where the facts were quite similar to those in the instant case. For present purposes we may assume that the presumption is not conclusive, and that the inference is rebuttable. Cf. *United Life & Accident Ins. Co. v. Prostic,* 169 Md. 535, 540.

This view, and this construction of the statute, finds support in the decisions of other states. See *Commonwealth v. Lessner,* 118 A. 24 (Pa.) ; *Commonwealth v. Sterling,* 170 A. 258 (Pa.) ; *Commonwealth v. Wooding,* 50 A. 2d 328 (Pa.) ; *People v. Lytton,* 178 N. E. 290 (N.Y.) ; *Frady v. People,* 40 P. 2d 606 (Colo.). We find nothing to the contrary in Hochheimer's, *Criminal Law* (1911), p. 36, relied on by the appellant, where the author says that the killing must be "within the scope of the perpetrator's design." A threat to kill being implicit in an armed robbery, when a killing follows it is within the general intent and contemplation of the perpetrator, and so supports an inference of malice. The test is not wholly subjective. An intent to rob by means of a deadly weapon may be found, for example, even where there is no actual intent or even ability to execute the implied threat in the event of resistance. See *Hayes v. State,* 211 Md. 111, 115. That seems to have been the common-law theory, and it is not altered by the statutes cited. Under the circumstances of the instant case we hold that there was evidence to support the verdict.

The triers of fact may well have believed that Stansbury was not so intoxicated, if intoxicated at all, as to be incapable of forming an intent either to rob or to kill. Voluntary intoxication is not an excuse, justification or extenuation of a crime, although it may be considered by the triers of fact as bearing upon the state of mind of the accused. See *Chisley v. State, supra* (p. 107), and *Saldiveri v. State,* 217 Md. 412, 424.

The appellant contends that the court erred in finding the appellant sane. There was no plea of insanity, and no request for any ruling on the subject. In rendering the verdict,

the court indicated that it had considered the report and testimony of Dr. Guttmacher, offered by the defense, and his statement that, while the patient has dull intelligence, "there is no evidence whatever that he is suffering from a psychosis and he must clearly be considered a responsible agent." If we assume, without deciding, that the question of insanity was in issue, there was no evidence to establish it. Dr. Guttmacher testified that the accused was "a classical example of a sociopath", but he clearly stated that in his opinion the accused was not committable to an insane asylum. "This man has shown an anti-social conduct but so far as I am able to determine it doesn't follow any well defined neurotic pattern where it is repetitive in nature." In reply to a question as to his report that the accused was "a responsible agent under the Maryland Sanity Test", he replied: "I didn't feel there was any doubt in this case." We have so recently indicated our adherence to the established test as to sanity, that it is unnecessary to discuss the matter further. See *Daniels v. State, supra* (p. 99); *Saldiveri v. State, supra* (p. 422).

Finally, the appellant contends that the court should have continued the case until after the co-defendants had been tried. Fitzgerald and Rich were summoned by the appellant, but refused to testify on the ground of self-incrimination. At the conclusion of the whole case, counsel for the appellant stated that the co-defendants' testimony would substantiate the testimony of the appellant that the robbery had not been planned, and moved that the verdict be deferred until the other cases had been tried and that their testimony then be considered as part of the testimony in the instant case. The State declined to stipulate as to the use of such testimony, and the court denied the motion. We find no abuse of discretion. The law is clear that the matter of continuing or reopening a case is ordinarily discretionary with the trial court, and that to constitute reversible error, there must be a showing of prejudice. *Jackson v. State,* 214 Md. 454, 459; *Schroder v. State,* 206 Md. 261, 265. We find no such showing in the instant case. The appellant had admitted the robbery, but had denied that it was planned before he and Fitzgerald entered the Coronet Bar, although he admitted having had some

discussion about hold-ups in general. The State produced no evidence of a prior plan, and the court, in rendering the verdict, expressly stated that it was unnecessary for the court "to determine whether the robbery of the Coronet Bar had been planned by the defendant and all or any of his companions prior to the entry into the bar of the defendant and Fitzgerald." Thus, there was no issue as to which the proffered testimony would be material, and, if there was, it plainly appears that it played no part in the findings of the court.

*Judgment affirmed.*