512 A.2d 358

James Robert SHELL,

v.

STATE of Maryland.

No. 17, Sept. Term, 1985.

Court of Appeals of Maryland.

July 24, 1986.

Nancy S. Forster and Julia Doyle Bernhardt, Asst. Public Defenders (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Ann E. Singleton, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

ELDRIDGE, Judge.

This appeal concerns inconsistent verdicts in a nonjury criminal trial resulting in part from confusion in the law as to the relevance of voluntary intoxication to various criminal charges. James Robert Shell contends that he should

not have been convicted by the trial judge of use of a handgun in the commission of a felony or crime of violence after he had been acquitted by the judge, because of voluntary intoxication, of the underlying felony or crime of violence. He also maintains that the finding of intoxication refuted the criminal states of mind which are elements of the crimes of wilfully and maliciously destroying the property of another and knowingly transporting a handgun.

## I.

According to the evidence introduced at his trial, on the evening of February 14, 1983, Mr. Shell set in motion the events leading to this appeal, having earlier ingested P.C.P. and other drugs as well. At about 5:30 that evening Shell was in his van stuck in the snow near his home in the Aspen Hill section of Montgomery County. Gregory DaPron, a stranger to Shell, saw the van and approached on foot to offer help. Shell told him to stay away and pointed a handgun at him. Mr. DaPron started to run, but Shell fired at him through the windshield twice, injuring Mr. DaPron with both bullets. The police later found the handgun between the front seats of the van.

About half an hour after shooting Mr. DaPron, Shell went to the door of Ernest and Fleta Wombacher in Silver Spring. Mrs. Wombacher answered the door. Shell forced his way in, demanding to use a telephone. Mrs. Wombacher ran upstairs screaming for her husband, followed by Shell. When Shell repeated his demand for a telephone Mr. Wombacher handed him a cordless telephone. Shell said: "That's no telephone; that's a radio." He snapped the antenna, dropped the telephone to the floor, and crushed it underfoot. According to Mrs. Wombacher,

"my husband said to him, 'Why do you act like that, we're Christian people and we don't fight.' He said, 'I don't believe it.' And so my husband—he said, 'If you show me a Bible I would believe it.' So my husband showed him about three of them and showed him a certificate

framing on the wall where my husband was ordained in 1950."

Shell "seemed to soften up a little bit" and pulled out his own Bible.

Thereafter the Wombachers were able to coax Shell downstairs, where he unsuccessfully attempted to use a wall phone in the kitchen, and then into their car for a ride to a nearby hospital. In the car the Wombachers kept up a disjointed conversation "on things that we thought would soften him up," such as their respective faiths, "the confusions of the world," and Shell's mother in South Carolina.

At the hospital emergency desk Mrs. Wombacher spoke for Shell. The woman at the desk reached for her telephone. At this point, according to Mrs. Wombacher,

"when she reached for the phone, he seemed to have a terrible feeling about phones. He grabbed the phones and just tore them out of the wall. And then the security came."

The hospital security guards restrained Shell and placed him in a strait jacket. A search for identification papers disclosed foil packets with traces of P.C.P. in Shell's pocket.

Shell was indicted in the Circuit Court for Montgomery County on charges of attempted murder of Mr. DaPron in the first and second degrees, unlawful shooting of DaPron with intent to maim, use of a handgun in the commission of a crime of violence, knowingly transporting a handgun, breaking and entering the dwelling of another, assault upon Mrs. Wombacher, two counts of malicious destruction of property, and two counts of possession of controlled dangerous substances. The assault count was later nol prossed.

After a nonjury trial, at which the principal issue was the defendant's state of mind, the trial court "declined to find

the Defendant not guilty by reason of insanity."[1]  The court acquitted Shell of attempted first degree murder, convicted him of the drug possession charges, and took the remaining charges under advisement.

The trial court disposed of the remaining charges in a written opinion and order filed on November 20, 1983. First, citing *State v. Gover*, 267 Md. 602, 298 A.2d 378 (1973), the court found that on February 14, 1983, Shell had become so intoxicated that he possessed no reason or understanding, and thus could not form the requisite *mens rea* for attempted murder in the second degree of Gregory DaPron.  The trial judge stated:

> "The testimony proffered by both the State and the defense indicates that the Defendant was suffering from a mental incapacity and psychosis and that his drug intoxication prevented him from understanding the criminality of his conduct.  The State's psychiatrist further testified that Mr. Shell's psychosis was similar to that of a paranoid schizophrenic as far as the symptoms were concerned; ... but that his condition was not a fixed or permanent psychosis."

Accordingly, the judge ruled that Shell lacked the intent required for a conviction of attempted murder in the second degree.

Next, addressing the charge of unlawful shooting with intent to maim, the trial court held that voluntary intoxication could negate the element of intent to maim.  The court, however, pointing out that simple assault was a lesser included offense of shooting with intent to maim, and holding that voluntary intoxication was not relevant to the elements of simple assault, convicted the defendant of as-

---

1.  The "not guilty by reason of insanity" terminology is no longer appropriate in this State.  *See Pouncey v. State,* 297 Md. 264, 465 A.2d 475 (1983); *Langworthy v. State,* 284 Md. 588, 399 A.2d 578 (1979).

saulting Mr. DaPron. In this Court, Shell does not contest the assault conviction.[2]

Turning to the handgun charges, the trial judge decided that she could convict Shell of use of a handgun in the commission of a felony or a crime of violence, even though she had acquitted him of the predicate felony or crime of violence. She found that Shell was guilty of using a handgun in the commission of a felony against Mr. DaPron, despite the fact that Shell was not guilty of the felony because of his intoxication. The judge was of the view that the offense of use of a handgun in a felony or crime of violence lacked elements which could be negated by voluntary intoxication. The trial judge also found the defendant guilty of knowingly transporting a handgun, ruling that voluntary intoxication cannot negate any elements of that offense.

Finally, the trial judge determined that voluntary intoxication was immaterial to the elements of breaking and entering the dwelling house of another and willfully and maliciously destroying the property of another. The defendant accepts his breaking and entering conviction but contests the destruction of property convictions on the ground that his voluntary intoxication negated the elements signified by the words "wilfully and maliciously."

The Court of Special Appeals, in an unreported opinion, affirmed. We granted the defendant's petition for a writ of

---

**2.** The defendant Shell had never been expressly charged with simple assault upon Mr. DaPron. Nevertheless, the trial judge was of the view that whenever a defendant is charged with an offense, he may be convicted of any lesser included offense even though the lesser included offense is a separate crime and is not mentioned in the charging document. The Court of Special Appeals has taken the same position. *See Grimes v. State,* 44 Md.App. 580, 583, 409 A.2d 767 (1980), *rev'd on other grounds,* 290 Md. 236, 429 A.2d 228 (1981). This Court has not decided the question. *Grimes v. State, supra,* 290 Md. at 240, 429 A.2d 228; *Bennett v. State,* 229 Md. 208, 217, 182 A.2d 815 (1962). We have, on more than one occasion, issued a writ of certiorari to resolve the issue but were unable to reach it. *See, e.g., Grimes,* 290 Md. at 240, 429 A.2d 228. Similarly, as the defendant has not raised the issue in this Court, it is not before us. Maryland Rule 813. *See* note 3, *infra.*

certiorari to determine whether, in this nonjury trial, acquittal of the predicate felony or crime of violence required acquittal of use of a handgun in the commission of the felony or crime of violence, and to determine whether evidence of voluntary intoxication can negate the "knowing" element of transporting a handgun and the mens rea elements of wilfully and maliciously destroying the property of another.[3]

## II.

█ The State contends that *Ford v. State,* 274 Md. 546, 337 A.2d 81 (1975), and other cases, support the view that an accused may be convicted in a nonjury trial of the handgun offense under Art. 27, § 36B(d), even if the judge finds that the defendant did not commit the felony or crime of violence.[4] We disagree.

---

**3.** The questions presented in the defendant's petition for a writ of certiorari were set forth as follows:

"1. In a court trial, did acquittal of the predicate felony or crime of violence require acquittal of use of a handgun in the commission of a felony or crime of violence where the court found that voluntary intoxication negated the specific intent required for conviction of the predicate crimes?

"2. Does the crime of malicious destruction of property require proof of a specific intent, such that voluntary intoxication will negate that intent?

"3. Does the crime of knowingly transporting a handgun by vehicle require proof of specific intent, such that voluntary intoxication will negate that intent?"

**4.** Maryland Code (1957, 1982 Repl.Vol.), Art. 27, § 36B(d) provides:

"(d) *Unlawful use of handgun in commission of crime.*—Any person who shall use a handgun in the commission of any felony or any crime of violence as defined in § 441 of this article, shall be guilty of a separate misdemeanor...."

Section 441 provides:

"(e) The term *"crime of violence"* means abduction; arson; burglary, including common-law and all statutory and storehouse forms of burglary offenses; escape; housebreaking; kidnapping; manslaughter, excepting involuntary manslaughter; mayhem; murder; rape; robbery; and sodomy; or an attempt to commit any of the aforesaid offenses; or assault with intent to commit any other offense punishable by imprisonment for more than one year."

The defendant in *Ford* was tried before a jury. The jury was instructed to deliver verdicts on charges of robbery with a deadly weapon, robbery, assault and use of a handgun in the commission of a felony, and it acquitted Ford of all but the last charge. In affirming the handgun conviction, this Court stated as follows (274 Md. at 550–551, 337 A.2d 81):

> "[S]ection 36B(d) requires the trier of fact to determine beyond a reasonable doubt, from the evidence, that the accused used a handgun during the commission of either a felony or a crime of violence as a prerequisite to being convicted of unlawfully using a handgun in the commission of either."

Consequently, commission of a felony or crime of violence is an essential ingredient of the § 36B(d) handgun offense. It is an element of the crime. If the jury determines that the accused did not commit a felony or crime of violence but is guilty of use of a handgun in the commission of such felony or crime of violence, the jury has obviously rendered inconsistent verdicts. The *Ford* opinion, while recognizing that the verdicts were inconsistent, upheld the conviction because of the many cases in this Court which had "repudiated the assertion that *jury* verdicts must be consistent...." (*Ford, supra,* 274 Md. at 552, 337 A.2d 81, emphasis added).

Later, in *Mack v. State,* 300 Md. 583, 479 A.2d 1344 (1984), we reviewed the *Ford* case as follows (300 Md. at 593–594, 479 A.2d 1344):

> "Thus, this Court established ... [in *Ford* ] that in order to convict an accused of use of a handgun in the commission of a crime of violence it is necessary that the trier of fact find beyond a reasonable doubt that the accused committed a crime of violence. In essence, this Court recognized that when an accused is charged in a multicount indictment with the commission of a crime of violence and use of a handgun in the commission of such a crime, a verdict of guilty of the crime of violence is a prerequisite to a verdict of guilty of use of a handgun in the commission of such a crime.

"Additionally, in *Ford,* this Court pointed out that if an accused is found guilty of both the crime of violence and use of a handgun in the commission of such a crime, the verdicts are consistent and they can both stand. If, however, there is a verdict of not guilty of the crime of violence and a verdict of guilty of use of a handgun in the commission of such a crime, the verdicts are inconsistent."

In light of these principles, the Court in *Mack* took the position that "verdicts [of] not guilty of the crime of violence and guilty of use of a handgun in the commission of such a crime ... would be contrary to law," *id.* at 595, 479 A.2d 1344. Consequently, we held that "a trial court in a criminal case must, if requested by the accused, instruct a jury that an accused cannot be found guilty of use of a handgun in the commission of a crime of violence under ... Art. 27, § 36B(d) if found not guilty of a crime of violence as defined in ... Art. 27, § 441(e)." *Id.* at 587, 479 A.2d 1344. The Court pointed out that the refusal to set aside the inconsistent jury verdicts in *Ford* was "premised upon the unique role of the jury, [and] had no impact whatsoever upon the substantive law explicated by the Court." *Id.* at 594–595, 479 A.2d 1344.

Thus, convictions based on inconsistent jury verdicts are tolerated because of the singular role of the jury in the criminal justice system. As stated in *Ford, supra,* 274 Md. at 553, 337 A.2d 81, there is a "reluctance to interfere with the results of unknown jury interplay," at least without proof of "actual irregularity." Ample precedent in Maryland and in other jurisdictions supports this practice. *Id.* at 551–553, 337 A.2d 81. The general view is that inconsistencies may be the product of lenity, mistake, or a compromise to reach unanimity, and that continual correction of such matters would undermine the historic role of the jury as the arbiter of questions put to it. *United States v. Powell,* 469 U.S. 57, ——, 105 S.Ct. 471, 476–478, 83 L.Ed.2d 461 (1984) (refusing to vacate conviction for using the telephone to facilitate drug crimes, of which defendant was acquitted by

jury); *Ford, supra; Johnson, Etc. v. State,* 238 Md. 528, 541–545, 209 A.2d 765 (1965). *See also Williams v. State,* 204 Md. 55, 67–72, 102 A.2d 714 (1954) (discussing reasons for not questioning jury verdicts).

In the present case, however, the inconsistent verdicts were rendered by a judge, not by a jury. The *Ford* holding does not justify inconsistent verdicts from the trial judge.

In *Johnson v. State, supra,* 238 Md. at 541, 209 A.2d 765, this Court observed that not all inconsistent verdicts are permitted to stand, pointing to "inconsistent verdicts of guilty under different counts of the same indictment, when both counts depended upon the same alleged acts...." The *Johnson* opinion went on to point out that inconsistent jury verdicts, one of acquittal and one of conviction, may stand because, while the verdicts are perhaps the result of compromise or mistake, there should not be speculation into such matters. The Court in *Johnson* then distinguished between inconsistent jury verdicts and inconsistent nonjury verdicts, and discussed with approval the opinion of the United States Court of Appeals for the Second Circuit in *United States v. Maybury,* 274 F.2d 899 (2d Cir.1960). The *Johnson* Court quoted from *Maybury* as follows (238 Md. at 543, 209 A.2d 765):

> " 'None of these considerations [justifying inconsistent jury verdicts] is fairly applicable to the trial of a criminal case before a judge. There is no "arbitral" element in such a trial. While the historic position of the jury affords ample ground for tolerating the jury's assumption of the power to insure lenity, the judge is hardly the "voice of the country," even when he sits in the jury's place. \* \* \* There is no need to permit inconsistency in the disposition of various counts so that the judge may reach unanimity with himself; on the contrary, he should be forbidden this easy method for resolving doubts. \* \* \* We do not believe we would enhance respect for law or for the courts by recognizing for a judge the same right

to indulge in "vagaries" in the disposition of criminal charges that, for historic reasons, has been granted the jury. 274 F.2d at 903.'

" '[W]e reverse for inconsistency * * * because we can have no confidence in a judgment convicting Maybury of one crime when the judge, by his acquittal of another, appears to have rejected the only evidence that would support the conviction here.' 274 F.2d at 905."

The Court in *Johnson* went on to hold, however, that where a trial judge on the record explains an apparent inconsistency in the verdicts, and where the explanation shows that the trial court's action was "proper" and that there was no "unfairness," the verdicts would be sustained. *Id.* at 545, 209 A.2d 765. In that case, the Court pointed out that "[o]n their face, if what the judges said be disregarded, the verdicts would be inconsistent," but that "[w]hat they did, in substance, was in accord with the proper administration of justice." [5] *Id.* at 544–545, 209 A.2d 765.

The rule applied in the *Johnson* and *Maybury* cases, which distinguishes between inconsistent verdicts in a jury trial and such verdicts in a nonjury trial, has been adopted in other jurisdictions. *See, e.g., U.S. v. Duz-Mor Diagnostic Laboratory, Inc.,* 650 F.2d 223, 226 (9th Cir.1981); *Haynesworth v. United States,* 473 A.2d 366, 368 (D.C. 1984); *People v. Vaughn,* 409 Mich. 463, 295 N.W.2d 354

---

**5.** The defendants in *Johnson* were charged in four separate indictments with various crimes. Several counts charged assaults, aggravated assaults, assault and battery, rape, kidnapping, robbery, armed robbery, larceny, and receiving stolen goods. The trial court, consisting of two judges, granted motions to dismiss some of the assault charges but stated that the "decision of the court with respect to these motions is not to be construed as indicating that there is an insufficiency of evidence in the case as to an assault and battery in connection with the rape" and kidnapping charges. 238 Md. at 540, 209 A.2d 765. The defendants argued in this Court that the dismissal of the assault charges was inconsistent with the convictions on the rape and kidnapping charges. In light of the trial court's explanation, however, there was no inconsistency and the convictions were affirmed.

(1980); *People v. Williams,* 99 Mich.App. 463, 297 N.W.2d 702 (1980).[6]

Moreover, in light of our recent opinion in *Mack v. State, supra,* it would be the height of appellate inconsistency for us to depart from the principles of *Johnson* and *Maybury* and hold that inconsistent verdicts in nonjury trials will generally be permitted and will be sustained in the present case. It would make utterly no sense to require a trial judge to instruct the jury "that an accused cannot be found guilty of use of a handgun in the commission of a crime of violence ... if found not guilty of a crime of violence," *Mack,* 300 Md. at 587, 596, 479 A.2d 1344, but to hold that the trial judge himself is permitted to ignore this rule.

The case at bar is not one in which there is only an apparent inconsistency which in substance disappears upon review of the trial court's explanation. Unlike the situation in *Johnson,* the trial court's findings in this case are not consistent with the challenged guilty verdict. To reiterate, in *Johnson,* when dismissing some of the assault charges, the trial court found that the defendants committed the assaults which were elements of the rape and kidnapping charges. In the instant case, on the other hand, the trial court found that the defendant did not commit the felony or

---

**6.** In many jurisdictions, however, some inconsistent verdicts of acquittal and conviction are not tolerated even when rendered by juries. *See, e.g., De Sacia v. State,* 469 P.2d 369 (Alaska 1970); *Redondo v. State,* 403 So.2d 954 (Fla.1981); *Kuck v. State,* 149 Ga. 191, 99 S.E. 622 (1919); *People v. Frias,* 99 Ill.2d 193, 75 Ill.Dec. 674, 457 N.E.2d 1233 (1983). At the other extreme are cases taking the position that inconsistent verdicts are permitted whether rendered in jury or nonjury trials. *See, e.g., United States v. West,* 549 F.2d 545, 553 (8th Cir.), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1601, 51 L.Ed.2d 806 (1977); *Flowers v. State,* 221 Ind. 448, 48 N.E.2d 56 (1943); *Commonwealth v. Harris,* 239 Pa.Super. 603, 360 A.2d 728 (1976).

Finally it should be noted that, while the United States Supreme Court has not decided as a matter of nonconstitutional federal criminal law "the significance that an appellate court may attach to an apparent inconsistency in a verdict that is subject to review on direct appeal," it has decided that an inconsistent verdict in a nonjury trial "would not create a [federal] constitutional defect" authorizing a federal court remedy under 28 U.S.C. § 2254. *Harris v. Rivera,* 454 U.S. 339, 343–344, 102 S.Ct. 460, 462–463, 70 L.Ed.2d 530 (1981).

crime of violence which is an element of the handgun charge. If the defendant lacked the required *mens rea* to have committed the predicate felony or crime of violence, as the court found, then an element or "prerequisite" [7] of the § 36B(d) handgun offense was lacking. In light of the *Mack, Ford* and *Johnson* opinions, the defendant Shell's conviction of the § 36B(d) handgun offense must be reversed.[8]

### III.

We turn now to Shell's contention that his intoxication prevented him from destroying property (the telephones belonging to the Wombachers and the hospital) "wilfully and maliciously" [9] and transporting a handgun in a vehicle "knowingly." [10]

### A.

Preliminarily, we shall review some of the Maryland cases dealing with the asserted defense of voluntary intoxication. Voluntary intoxication as a defense to some criminal charges is clearly recognized in Maryland. In *Spencer*

---

7. *Ford v. State, supra,* 274 Md. at 550, 337 A.2d 81.

8. The circumstances of the present case should be distinguished from a situation where the trial judge finds that all of the elements of the predicate felony or crime of violence are present but does not render a guilty verdict on that charge for unrelated reasons, such as a finding that the predicate crime merges into some other offense. In the latter situation, as in *Johnson,* the absence of a guilty verdict on one charge might *appear* to be inconsistent with the guilty verdict on another charge, but the trial judge's findings would satisfactorily explain the apparent inconsistency.

9. Code, Art. 27, § 111 provides in part:
   "Any person who shall wilfully and maliciously destroy, injure, deface or molest any real or personal property of another shall be deemed guilty of a misdemeanor...."

10. Code, Art. 27, § 36B(b) provides in part, subject to exceptions not pertinent here:
   "Any person who shall ... knowingly transport any handgun ... in any vehicle ... shall be guilty of a misdemeanor...."

*v. State,* 69 Md. 28, 13 A. 809 (1888) (Alvey, C.J.), this Court noted as a general principle that evidence of intoxication was admissible to negate the *mens rea* required for a first degree murder conviction. 69 Md. at 41–42 (majority), 46–50 (dissent), 13 A.2d 809.[11]

In *Chisley v. State,* 202 Md. 87, 95 A.2d 577 (1953), Chisley was convicted of first degree murder. On appeal, he challenged the sufficiency of the evidence underlying the first degree murder conviction, relying in part upon his alleged intoxicated state at the time of the killing. The Court held, inter alia, that there was sufficient evidence to submit the first degree murder charge to the jury and that the jury was properly instructed "as to the necessity for considering the effect of intoxication on the formation and existence of wilfullness, deliberation and premeditation." 202 Md. at 108, 95 A.2d 577.

Following the holding in *Chisley, supra,* the Court in *Beall v. State,* 203 Md. 380, 101 A.2d 233 (1953), affirmed

---

**11.** Under the early English common law, voluntary intoxication was no defense. 1 W. Hawkins, *A Treatise of the Pleas of the Crown,* Ch. 1, § 6 at 2 (1716) ("And he who is guilty of any Crime whatever, thro' his voluntary Drunkenness, shall be punished for it as much as if he had been sober."); 4 W. Blackstone, *Commentaries on the Laws of England,* Ch. 2, § III at 25–26, Lewis ed. at 1443 (1898) ("[T]he law of England, considering how easy it is to counterfeit this excuse, and how weak an excuse it is, (though real,) will not suffer any man thus to privilege one crime by another.")

The rule has been traced back as far as *Reniger v. Fogossa,* 1 Plow. 1, 19, 75 Eng.Rep.1, 31 (Exch. Ch. 1551). In this country the departures from the early English rule came after murder was divided into degrees, whereupon evidence of intoxication was admitted to negate premeditation and deliberation. *E.g., Pennsylvania v. M'Fall,* Add. 255 (Cty. Ct.1794); *Kelly v. Commonwealth,* 1 Grant's Cases 484, 492 (Pa.1858); *Pirtle v. State,* 9 Humphreys 663, 28 Tenn. 663 (1849). *See also Hopt v. People,* 104 U.S. 631, 633–634, 14 Otto 631, 633–634, 26 L.Ed. 873 (1881). *Cf. People v. Rogers,* 18 N.Y. 9, 26 (1858).

Once established, the exception allowing drunkenness to disprove the *mens rea* for first degree murder proved adaptable to other offenses requiring a particular *mens rea. See Pigman v. Ohio,* 14 Ohio 555 (1846) (drunkenness a defense to knowingly passing a counterfeit banknote); *Director of Public Prosecution v. Beard* [1920] A.C. 479, All E.R. 21, 12 A.L.R. 846 (tracing the development of the voluntary intoxication defense in England).

convictions for assault with intent to murder, rejecting the contention that the defendant was too drunk to intend to kill. The Court stated: "As a defense to intent here the accused must show that he was so intoxicated that he was robbed of his mental faculties. He is criminally responsible as long as he retains control of his mental faculties sufficiently to appreciate what he is doing." 203 Md. at 386, 101 A.2d 233.

In *Saldiveri v. State*, 217 Md. 412, 143 A.2d 70 (1958), the defendant appealed his conviction for an unnatural and perverted sexual practice on an eight-year old girl. He claimed that he did not know right from wrong at the time of the offense because of the alcohol he had imbibed and the amytal administered to him. The Court held the evidence of intoxication insufficient, stating that "voluntary drunkenness is generally not a defense to a crime." 217 Md. at 424–425, 143 A.2d 70.

Voluntary intoxication was also an issue in *Stansbury v. State*, 218 Md. 255, 146 A.2d 17 (1958). There the defendant was convicted of felony murder. This Court affirmed the conviction, saying (218 Md. at 261, 146 A.2d 17):

"The triers of fact may well have believed that Stansbury was not so intoxicated, if intoxicated at all, as to be incapable of forming an intent either to rob or to kill. Voluntary intoxication is not an excuse, justification or extenuation of a crime, although it may be considered by the triers of fact as bearing upon the state of mind of the accused."

Similarly, in *Breeding v. State*, 220 Md. 193, 199, 151 A.2d 743 (1959), the Court affirmed a first degree murder conviction, saying: "Voluntary drunkenness is generally not a defense. Moreover, the triers of fact could properly find, as they did, that the accused was not drunk at the time of the murder."

The defendant in *Lipscomb v. State*, 223 Md. 599, 165 A.2d 918 (1960), was convicted of rape and first degree murder. In response to Lipscomb's claim that he was

under the influence of alcohol at the time he committed the acts, this Court said: "However, even if he was drunk on these occasions, it is the general rule that voluntary drunkenness does not relieve an individual of responsibility for his crimes." 223 Md. 603–604, 165 A.2d 918. In *Clark v. State*, 236 Md. 648, 207 A.2d 94 (1964), the Court held that under the circumstances voluntary drunkenness was not a valid defense to the charge of breaking and entering with intent to steal, noting that the evidence tended to show that the defendant was "in possession of his faculties."

The Court gave more detailed consideration to the voluntary intoxication issue in *Avey v. State*, 249 Md. 385, 240 A.2d 107 (1968). Avey was convicted of assault with intent to murder and storehouse breaking. This Court reversed the judgments and remanded for a new trial because the trial judge had failed to give adequate instructions on voluntary intoxication. The Court approved the "majority rule" that "where intoxication exists to a degree that it deprives the accused of his capacity to form a specific intent, he cannot be convicted of a crime requiring that intent, *e.g.* assault with intent to kill or maim. . . ." 249 Md. 388, 240 A.2d 107.

The Court amplified the *Avey* holding in *State v. Gover*, 267 Md. 602, 298 A.2d 378 (1973). The defendant in *Gover* was convicted of robbery with a deadly weapon after the trial judge ruled that voluntary intoxication, regardless of its degree, could not serve as a defense to an armed robbery charge. This Court held that voluntary intoxication rendering an accused unable to formulate the intent to steal was a defense to a charge of robbery or larceny, reasoning that the defense was recognized in "other specific intent crimes" such as intent to murder. 267 Md. at 606–607, 298 A.2d 378. The Court emphasized, however, that the degree of intoxication required to negate specific intent was substantial, saying (*id.* at 607–608, 298 A.2d 378):

"[T]he degree of intoxication which must be demonstrated to exonerate a defendant is great. Evidence of drunkenness which falls short of a proven incapacity in the

accused to form the intent necessary to constitute the crime merely establishes that the mind was affected by drink so that he more readily gave way to some violent passion and does not rebut the presumption that a man intends the natural consequence of his act."

The question, as formulated by the *Gover* Court, is whether a defendant

"has reached that stage of intoxication that renders him incapable of forming the requisite *mens rea* which is a necessary element of all specific intent crimes." *Id.* at 608, 298 A.2d 378.

The Court remanded the case to allow the trial judge to determine "whether Gover was so drunk as to paralyze his mental faculties and render him incapable of entertaining the design to take and permanently convert the property of another to his own use." *Ibid.*

The distinction between the categories of crime, such as "specific intent" crimes or "general intent" crimes, for which voluntary intoxication is or is not relevant to guilt, was explained by Judge Moylan for the Court of Special Appeals in *Smith v. State*, 41 Md.App. 277, 305, 398 A.2d 426, *cert. denied*, 284 Md. 748 (1979):

"A specific intent is not simply the intent to do the immediate act but embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate act. Though assault implies only the general intent to strike the blow, assault with intent to murder, rob, rape or maim requires a fully formed and conscious purpose that those further consequences shall flow from the doing of the immediate act. To break and enter requires a mere general intent but to commit burglary requires the additional specific intent of committing a felony after the entry has been made. A trespassory taking requires a mere general intent but larceny (or robbery) requires the specific *animus furandi* or deliberate purpose of depriving the owner permanently of the stolen goods. This is

why even voluntary intoxication may negate a specific intent though it will not negate a mere general intent.

\* \* \* \* \* \*

"The larger class 'specific intent' includes such other members as 1) assault with intent to murder, 2) assault with intent to rape, 3) assault with intent to rob, 4) assault with intent to maim, 5) burglary, 6) larceny, 7) robbery and 8) the specific-intent-to-inflict-grievous-bodily-harm variety of murder. Each of these requires not simply the general intent to do the immediate act with no particular, clear or undifferentiated end in mind, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result."

The above-quoted review generally reflects the positions taken in the recent opinions of this Court, particularly *Avey* and *Gover*.[12]

Maryland's view, deeming voluntary intoxication relevant to "specific intent" crimes but not "general intent" crimes, is also the approach taken in most other jurisdictions. Only a few jurisdictions provide that any mental state, including recklessness, can be negated by voluntary intoxication.[13] At the other extreme, just a few states by statute treat voluntary intoxication as irrelevant unless it produces insan-

---

**12.** The specific intent/general intent concept is not inconsistent with the treatment of voluntary intoxication elsewhere in the law. In contracts, for example, we have said that "[i]f a man is so intoxicated that he is substantially *non compos mentis* his contract will be held invalid...." *Lynn v. Magness,* 191 Md. 674, 682, 62 A.2d 604 (1948). In assessing the admissibility of a confession, evidence of intoxication may raise a jury issue as to the voluntariness of the confession. *Dempsey v. State,* 277 Md. 134, 154, 355 A.2d 455 (1976). In both instances the focus is on the mental capacity of the intoxicated person. In a torts context, however, we have held that one who intentionally becomes intoxicated is held to the same standard of responsibility as if he were sober. *Smith v. Branscome,* 251 Md. 582, 594, 248 A.2d 455 (1968) (drunk held liable for letting another drunk drive).

**13.** Hawaii and Iowa by statute admit evidence of voluntary intoxication whenever it is relevant to any element of an offense. Hawaii Rev.Stat. § 702–230 (1976); Iowa Code Ann. § 701.5 (1979).

ity.[14] Other jurisdictions fall somewhere in between these two positions, most employing the specific intent/general intent distinction or some variant.[15]

Courts and scholars have attacked the specific intent/general intent distinction as illogical and imprecise, and it is apparent from a review of some of the leading cases that the distinction developed as a way of classifying precedents holding voluntary intoxication material or not in various contexts. *See State v. Stasio*, 78 N.J. 467, 396 A.2d 1129 (1979) (concluding that the distinction between specific and general intent is unworkable); *People v. Hood*, 1 Cal.3d 444, 82 Cal.Rptr. 618, 462 P.2d 370 (1969) (Traynor, C.J.) (discussing the development of the specific intent/general intent distinction). *See also Linehan v. State*, 476 So.2d 1262, 1265 (Fla.1985) (adhering to specific intent/general

---

**14.** Missouri and Texas by statute preclude admission of voluntary intoxication evidence in all cases. Mo.Rev.Stat. § 562.076 (1979, 1986 Supp.); Tex. Penal Code Ann. § 8.04 (1974).

In a footnote in *Johnson v. State*, 292 Md. 405, 425 n. 10, 439 A.2d 542 (1982), discussing voluntary intoxication, there is language arguably suggesting a position like that of Missouri and Texas. Nevertheless, we do not believe that the *Johnson* opinion was intended to overrule cases such as *Gover* and *Avey*.

**15.** For example, Massachusetts, Virginia and Pennsylvania admit evidence of voluntary intoxication only in first degree murder cases. *Commonwealth v. Paszko*, 391 Mass. 164, 197, 461 N.E.2d 222, 243 (1984); *Essex v. Commonwealth*, 228 Va. 273, 281–282, 322 S.E.2d 216, 220 (1984); 18 Pa.Cons.Stat.Ann. § 308 (Purdon, 1983). Alaska, Arizona and Colorado allow voluntary intoxication to negate some forms of intent, but not a "knowing" mental state. Alaska Stat. §§ 11.81.630, 11.81.900 (1984); *State v. Reffitt*, 145 Ariz. 452, 464, 702 P.2d 681 (1985); *Hendershott v. People*, 653 P.2d 385, 396 (Colo.1982), *cert. denied*, 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983).

A clear majority of the states adhere to a specific intent/general intent distinction like ours. *See Annot.* 8 A.L.R.3d 1236 (1966, Supp. 1985). The Model Penal Code provides that intoxication "is not a defense unless it negatives an element of the offense," except "[w]hen recklessness establishes an element of the offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial." Model Penal Code § 2.08 and Comment (Official Draft, 1962, 1985 ed.). Thus voluntary intoxication can negate the elements of "purpose" and "knowledge" in the Code. *Id.*, § 2.08 Comment at 356.

intent distinction while recognizing difficulty in applying it); *Director of Public Prosecutions v. Majewski*, [1976] 2 All E.R. 142 (House of Lords) (rejecting defense of voluntary intoxication in assault and manslaughter prosecutions); *Director of Public Prosecutions v. Beard*, [1920] A.C. 479, All E.R. 21, 12 A.L.R. 846 (House of Lords) (formulating the specific intent/general intent distinction); J. Hall, *Intoxication and Criminal Responsibility*, 57 Harv.L.Rev. 1045, 1053–1066 (1944); M. Paulsen, *Intoxication as a Defense to Crime*, 1961 Univ. of Illinois L. Forum 1, 9 (1961); G. Williams, *Criminal Law, The General Part*, at 378 (1953). While the distinction may be illogical and somewhat arbitrary, it does serve to reconcile fairness to the accused with the need to protect the public from intoxicated offenders and to deter such persons. Accordingly we shall endeavor to apply the lines drawn by our prior cases.

### B.

The defendant Shell contends that his voluntary intoxication negated the mens rea elements of "wilfully and maliciously" destroying property.

Wilful and malicious destruction of property is proscribed by Code (1957, 1982 Repl.Vol.), Art. 27, § 111, as follows:

"Any person who shall wilfully and maliciously destroy ... personal property of another shall be deemed guilty of a misdemeanor...."

With respect to statutes imposing criminal sanctions upon those who "wilfully and maliciously" destroy or harm property, this Court has clearly indicated that effect must be given to both the element of wilfulness and the element of malice. *Brown v. State*, 285 Md. 469, 472–473, 475, 403 A.2d 788 (1979); *Rosenberg v. State*, 164 Md. 473, 475, 165 A. 306 (1933). In *Rosenberg*, the defendants were charged with "wilfully and maliciously" destroying a post standing on the property of another. At the trial, the defendants sought to introduce evidence that they were advised by counsel that they had a right to use the property (*i.e.*, an

easement), but the court refused to admit the evidence. The purpose of the testimony was to prove "that the removal of the post was not malicious." 164 Md. at 474, 165 A. 306. This Court reversed the convictions on the ground that the evidence was admissible, being relevant to the element of malice. With regard to the elements of the offense, the Court stated in *Rosenberg,* (*id.* at 476, 165 A. 306, emphasis added):

"The removal of the post was not a criminal act unless it was done 'wilfully and maliciously,' as charged in the indictment. Any evidence legitimately tending to refute that charge was pertinent to the issue. The term 'wilfully,' for the purposes of such an accusation, is used to characterize an act *done with deliberate intention* for which there is no reasonable excuse (*Cover v. Taliaferro,* 142 Md. 586, 122 A. 2), and the word 'maliciously' is descriptive of a wrongful act committed *deliberately* and without legal justification...." [16]

Later in *Gibson v. State,* 238 Md. 414, 209 A.2d 242 (1965), the Court affirmed convictions for "wilfully and maliciously" destroying a barbed wire fence on property owned by another in violation of Art. 27, § 111, where the evidence clearly showed that the defendants knew that the fence belonged to another, fully intended to destroy another's property, had a gun with them when cutting the fence, and "threatened to 'shoot [the owner's] legs out from under [him]' if he interfered." 238 Md. at 416, 209 A.2d 242. The Court in *Gibson, id.,* at 417, 209 A.2d 242, quoted the definitions of "wilfully" and "maliciously" as set forth in the *Rosenberg* case. *See also Seward v. State,* 208 Md. 341, 118 A.2d 505 (1955) (deliberately planting a bomb under and blowing up a water tower belonging to another).

---

**16.** Interestingly, the *Rosenberg* case and part of this quotation were relied on in *Chisley,* 202 Md. at 105, 95 A.2d 577, in discussing the elements of murder. *Chisley,* as previously mentioned, held that evidence of voluntary intoxication was relevant in a first degree murder prosecution.

A recent case in this Court, *Brown v. State*, 285 Md. 469, 403 A.2d 788 (1979), involved Art. 27, § 7, which criminally punishes "[a]ny person who wilfully and maliciously sets fire to or burns ... any barn, stable, garage or other building...." The defendant in *Brown* had burned a building owned by him in order to save demolition costs, and the Court of Special Appeals affirmed his conviction, concluding "that a showing of a deliberate intent to execute a burning was sufficient to prove both wilfulness and maliciousness ... because 'malice may be presumed [inferred] from the wilfullness of the act of burning.'" 285 Md. at 472–473, 403 A.2d 788, quoting *Brown v. State*, 39 Md.App. 497 at 509, 388 A.2d 130 (1978). This Court reversed, holding that "[t]o fail to draw a distinction between the meanings of 'maliciously' and 'wilfully' ... would render part of the statutory language surplusage, a construction to be avoided if possible." 285 Md. at 475, 403 A.2d 788. We stated, in an opinion by Judge Cole, "that a malicious act is one intended to bring harm to another person" and that " 'maliciously' differs from the term 'wilfully,' the latter commonly interpreted as meaning 'intentionally.'" *Id.* at 474–475, 403 A.2d 788.

The Court of Special Appeals dealt with the Art. 27, § 111, offense in *Duncan v. State*, 5 Md.App. 440, 248 A.2d 176 (1968). The evidence in *Duncan* showed that the defendant robbed a victim of money and car keys, got in the victim's car which was in a parking lot, "backed the car out of its parking space 'at a high rate of speed, stopped short, went forward, struck a light car that was parked next to it' and drove away." 5 Md.App. at 443, 248 A.2d 176. He was convicted of robbery and "wilfully and maliciously" injuring the victim's automobile, in violation of § 111. In reversing the latter conviction for evidentiary insufficiency, the Court of Special Appeals stated: "We do not think that the evidence before the lower court was sufficient to show that the appellant had a specific intent to damage the car; rather it appears that he took the car as a means of escape." *Id.* at 446, 248 A.2d 176. The court went on:

"Even though his actions may have been negligent, this is not enough." *Id.* at 447, 248 A.2d 176.[17] *See also Spears v. State,* 38 Md.App. 700, 708, 382 A.2d 616 (1978) (reversing a conviction under Art. 27, § 111, because "[w]e do not find evidence of a specific intent to cause damage").

Consequently, the offense proscribed by Art. 27, § 111, requires both a deliberate intention to injure the property of another and malice. The nature of the mens rea, as shown by the above-reviewed cases, is such that the crime should be characterized as a specific intent offense. Evidence of voluntary intoxication is, therefore, relevant in deciding whether the requisite mens rea is present. As the trial court found that Shell "was suffering a drug induced intoxication" at the time he destroyed the telephones, sufficient to negate specific intent offenses, the convictions under Art. 27, § 111, must be reversed.

## C.

Knowingly transporting a handgun in a vehicle is proscribed by Code (1957 Ed., 1981 Repl.Vol.), Art. 27, § 36B(b), as follows:

> "*Unlawful wearing, carrying, or transporting of handguns.*—Any person who shall wear, carry, or transport any handgun, whether concealed or open, upon or about his person, and any person who shall wear, carry or knowingly transport any handgun, whether concealed or open, in any vehicle traveling upon the public roads, highways, waterways, or airways or upon roads or parking lots generally used by the public in this State shall be guilty of a misdemeanor; and it shall be a rebuttable

---

**17.** There is language in *Duncan* suggesting that there is no difference "between 'wilfull' and 'malicious' as used in the statute" and that "gross negligence" might be enough to meet the mens rea elements. 5 Md.App. at 447–448, 248 A.2d 176. Such suggestions are inconsistent with our decisions in *Brown* and *Rosenberg,* and would appear to be inconsistent with the result in *Duncan.*

presumption that the person is knowingly transporting the handgun; ...."

The plain language of the statute includes the mens rea element of "knowingly" for a conviction of transporting a handgun in a vehicle.

Nevertheless, nothing in the statutory language suggests that, by the word "knowingly," the General Assembly intended to require that the prosecution establish a specific purpose of transporting a handgun. This is confirmed by the statutory language creating a rebuttable presumption that the transportation was done knowingly. The legislative purpose seems only to have been the exclusion of innocent violations, so that a person who shows that he was not aware that his vehicle was transporting a handgun will not incur penalties.

While sometimes the word "knowingly" in a statute creating a criminal offense might be deemed to signify a specific intent crime, the particular language and purpose of each statute must be considered. *See People v. Watts,* 133 Mich.App. 80, 82–83, 348 N.W.2d 39 (1984) (courts "have examined the intent behind the legislative or judicial inclusion of an element of knowledge in order to determine whether the crime is a specific intent crime"). The General Assembly enacted the handgun statute as a response to "an alarming increase in the number of violent crimes ... [which] involve the use of handguns;" "a substantial increase in the number of persons killed or injured which is traceable in large part, to the carrying of handguns on the streets and public ways" and to the perception that existing laws were not effective in curbing the use of handguns and preserving peace and tranquility. Art. 27, § 36B(a)(i)–(iv).

We conclude that where, as here, the knowledge element of the offense was included largely to prevent unwitting violations, and the purpose of the criminal provision as a whole is to curb the transportation of handguns in vehicles by persons drunk or sober, the General Assembly did not intend to create a specific intent crime. In this context, the

word "knowingly" requires only awareness by the accused that he engaged in the prohibited conduct, and this cannot be negated by evidence of voluntary intoxication. *Accord, People v. Lane,* 102 Mich.App. 11, 300 N.W.2d 717 (1980) (holding that the knowledge element of carrying a concealed weapon denoted general intent and could not be negated by evidence of voluntary intoxication).

The conviction for knowingly transporting a handgun in a vehicle was properly affirmed by the Court of Special Appeals.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED TO THAT COURT FOR ENTRY OF A JUDGMENT CONSISTENT WITH THIS OPINION. DEFENDANT TO PAY ONE–HALF OF THE COSTS AND MONTGOMERY COUNTY TO PAY ONE–HALF OF THE COSTS.

McAULIFFE, Judge, concurring and dissenting.

I concur with those portions of the majority opinion that relate to the handgun offenses, but dissent from the views expressed in Part III B of the opinion, and from the decision to reverse the convictions of malicious destruction of property, because I do not agree that a specific intent to damage property is an essential element of that offense.

The majority concludes that by the conjunctive use of the words "wilfully" and "maliciously" the Legislature necessarily intended the creation of a specific intent offense. I disagree.

The intent historically required as an element of malicious destruction of property is one that may be specific, or may be implied. In such a case, because proof of a specific intent is but an alternative and not an invariable method of proof, voluntary intoxication is not a defense. Nothing in our statute suggests that we should attribute either to the word "wilfully" or "maliciously" a meaning that would

cause the statutory offense to vary significantly from its common law predecessor.

As the United States Supreme Court has pointed out, "willfull ... is a word of many meanings, its construction often being influenced by its context." *Spies v. United States,* 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418 (1943). That Court has also said that the word denotes an act which is intentional rather than accidental, but when used in a criminal statute, it generally means an act done with a bad purpose. When so used, the Court said, something more is required than the doing of the act proscribed by the statute, and an evil motive to accomplish that which the statute condemns becomes a constituent element of the crime. *Screws v. United States,* 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945). In *Screws,* the Court found it necessary to give a very restrictive meaning to wilful, to avoid a constitutional question of vagueness that might otherwise be present in a statute. This Court has said that wilfully is commonly interpreted as meaning "intentionally." *Brown v. State,* 285 Md. 469, 475, 403 A.2d 788 (1979).

As used in this statute (Art. 27, § 111), the word "wilful" clearly requires a showing that the act was intentionally done, and was not accidental, nor the product of simple negligence, nor the result of coercion. Assuming that because of its inclusion in a penal statute, the word means more, and requires a showing of an evil intent, or an absence of legal grounds, or an act done without reasonable ground for believing it to be legal, this falls short of requiring proof of a specific intent. At least for purposes of determining when the defense of voluntary intoxication may properly be interposed, we should conclude that a required showing of "evil intent" or intent to do that which is prohibited by law, involves no more than a general intent.

The term "maliciously" is at least as chameleonic as "wilfully," suffering changes in meaning depending upon the context in which it is used. I am persuaded that its

intended meaning in the context of this statute is similar to its meaning in the law of homicide. Just as murder may be committed without any express (specific) intent to kill, so also may § 111 be violated without any express intent to cause damage to property. The intent ingredient of malice required to prove second degree murder may be express (an actual intent to kill) or it may be implied by law under certain circumstances. These circumstances include: 1) the presence of an intent to do serious bodily harm, or 2) a killing that occurs in the course of and as a result of an attempt to commit, or the commission of, certain felonies (felony murder), or 3) a killing which results from conduct that represents a wanton [1] and wilful disregard of an unreasonable risk to human life (depraved heart). Nothing in the development of the law of malicious mischief suggests that the requisite intent of that crime cannot also be implied. I agree with the conclusion of Professor Perkins, who said:

[T]he element of malice, as the special mental element of malicious mischief, requires either a specific intent to cause the destruction of, or substantial damage to, the property of another, *or an act done in wanton and wilful disregard of the plain and strong likelihood of such harm,* without any circumstances of justification, excuse or substantial mitigation. Stated in other words: The mens-rea requirement of malicious mischief is a property-endangering state of mind, without justification, excuse or mitigation.

R. Perkins, *Criminal Law* ch. 4 § 8, at 339 (2d ed. 1969) (emphasis added).

The majority reads *Brown v. State,* 285 Md. 469, 403 A.2d 788 (1979) and *Rosenberg v. State,* 164 Md. 473, 165 A. 306 (1933), to compel a contrary result. I do not. *Brown* did

---

1. As Professor Perkins pointed out, the "wanton" conduct contemplated here involves "an element of viciousness—an extreme indifference to the value of human life" and thus may be distinguished from lesser forms of criminal negligence that would support only a finding of manslaughter. R. Perkins, *Criminal Law* ch. 2 § 1, at 37 (2d ed. 1969).

not deal with § 111, but dealt with a charge of arson under § 7. The Court held only that "in an arson context"[2] a malicious act "is one intended to bring harm to another person." 285 Md. at 474, 403 A.2d 788. *Rosenberg* deals with the removal of a fence post by an adjacent property owner claiming an easement over the way obstructed by the post. The Court held that the evidence of the defendant's *bona fide* belief that he had a legal right to remove the obstruction was relevant and should have been admitted. Because malice involves an act done without legal justification, excuse or mitigation, and because an act done under a *bona fide* claim of right has generally been held to be justified or excused in malicious mischief cases, the Court properly held the evidence was material to the issue of malice.

I therefore disagree with the majority's conclusion that the offense proscribed by Art. 27, § 111 requires "a deliberate intention to injure the property of another." Such a specific intent will, of course, suffice, but so too will a wanton and wilful disregard of an obvious likelihood of damage to property. It follows then, that because the crime may be committed by a person harboring no specific intent, voluntary intoxication is not a defense. *See Chisley v. State*, 202 Md. 87, 106, 95 A.2d 577 (1953), holding that voluntary intoxication will not reduce murder to manslaughter, nor will it excuse the crime.

The evidence in this case was sufficient to support the trial judge's finding that Shell's actions involving two telephones were intentional, and not accidental. In the first instance, after being handed a cordless telephone in response to his demand for a telephone, Shell said, "that's no telephone that's a radio."[3] He then snapped the antenna,

---

**2.** This Court observed that historically arson was a crime against the habitation of individuals rather than an offense against property. *Brown v. State*, 285 Md. 469, 473, 403 A.2d 788 (1979).

**3.** Shell was partly correct. A cordless telephone is a radio transmitter and receiver, and is also part of a telephone system.

dropped the telephone to the floor and crushed it under foot. In the second instance he grabbed a telephone from a desk and tore its wire from the wall. In each instance the trial judge found that the act was done in wanton and wilful disregard of the plain and strong likelihood of harm to the property, even though Shell may not have been capable of forming a specific intent to cause such damage.

I would affirm the convictions of malicious destruction of property.

I am authorized to state that Chief Judge MURPHY and Judge RODOWSKY agree with the views expressed herein.