COURT OF APPEALS OF VIRGINIA

Present:   Judges Athey, Causey and Callins
Argued at Winchester, Virginia

ARTURO BARNES

v.        Record No. 0991-23-2

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE DOMINIQUE A. CALLINS
APRIL 23, 2024

FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
Gordon F. Willis, Judge

James Joseph Ilijevich for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Arturo Barnes of two counts of unlawfully shooting into an occupied

building and two counts of unlawful destruction of property. The same jury also acquitted Barnes

of second-degree murder and use of a firearm in the commission of a murder. Barnes argues that

the jury's verdicts, because inherently inconsistent, constitute an "actual irregularity," and as such,

should have been set aside.

BACKGROUND[1]

On June 3, 2021, Yarue Montgomery held a cookout in the parking lot of a strip mall. He

set up a grill in a grassy area between two stores known as "the cut," where he served food to

---

[1] On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

people from the neighborhood. Barnes was at the strip mall during the cookout to sell marijuana, and, while there, went inside a store.

Later, Barnes walked to a sedan and sat down in the passenger seat. Tyriek Powell—who had been feuding with Barnes's brother—arrived at the cookout, armed with a gun concealed in the waistband of his shorts. An individual called "Little Tay" approached Barnes to warn him that Powell had arrived. Powell approached the cut and stood in front of the sedan in which Barnes was seated; Barnes demanded that Powell "[g]et the f*** out of here." Montgomery saw Barnes, who had by then exited the sedan, "dr[a]w his gun." In response, Powell removed his own firearm from his waistband and "lifted it near his side." According to Montgomery, Barnes then shot at Powell, and Powell returned fire. While running for cover behind a parked car, Barnes continued to exchange fire with Powell. Three of Powell's bullets struck Barnes. Barnes fired five bullets at Powell, two striking Powell and three striking two stores directly behind where Powell initially stood, shattering the stores' glass entrances. Powell died from his injuries.

Montgomery drove Barnes to a hospital for treatment. During the drive, Barnes gave his firearm to Montgomery and said, "don't, don't," an instruction that "wasn't clear," but which Montgomery "kind of figured what he was trying to tell me in a sense." Montgomery subsequently threw Barnes's gun in the trash. When police interviewed Barnes at the hospital, he initially denied shooting Powell, claiming that Powell shot at him and that an unknown third party had returned fire. Barnes later stated, however, that he shot Powell in self-defense after Powell fired first.

Surveillance video shows Barnes minutes before the shooting standing outside of a store in the strip mall, and then sitting in the front passenger seat of a sedan. After Little Tay approaches the vehicle, interacts with Barnes, and walks away, Powell's lower half appears in frame, walking up the sidewalk, and then stopping in front of the vehicle. At first facing away

from Barnes, Powell can be seen turning around toward Barnes, who, by then, is stepping out of the vehicle. Barnes and Powell face each other for several seconds. During this time, the camera's view is partially obstructed by a column, and Barnes's hands are not visible to the camera; the video only shows the left side of Powell's body, below the waistline.

Suddenly, Barnes moves backward, bringing the upper portion of his body into the camera's frame. At the same time, Powell appears to step backward before running away from Barnes, out of camera view. Meanwhile, Barnes, running to the rear of the sedan, can be seen pointing his gun in Powell's direction and seeking shelter behind a vehicle parked nearby after dropping to the ground. Barnes hops on one foot in the direction of where Powell had stood before disappearing from camera view.

Barnes was charged with second-degree murder, use of a firearm in the commission of a murder, two counts of maliciously shooting into an occupied building, and two counts of intentional destruction of property. At trial, the jury received instructions defining the elements of the charged offenses, including their lesser-included offenses. The jury also received instructions on heat of passion and self-defense. Following closing arguments, the jury convicted Barnes of the lesser-included offenses of unlawfully shooting into an occupied building and unlawful destruction of property on the malicious shooting and intentional property destruction charges, but acquitted him of second-degree murder and use of a firearm in the commission of murder.

Barnes moved the trial court to set aside the jury's verdicts as inherently inconsistent. He asserted that the verdicts reflected an implicit finding that he shot Powell in self-defense and that such a finding negated the "unlawful" mens rea required to support his convictions. Such an inconsistency, he argued, constituted an "actual irregularity," requiring the trial court to "set aside and dismiss the remaining four indictments." The trial court denied the motion and

declined to "speculate as to why [the jurors] did what they did," noting that "there was a lot of evidence in the case[,] some of it even conflicting about who did what, when[,] and where[,] and it was for the trier of fact to hear all that[,] weigh the credibility[,] and come up with what they thought was a fair and just verdict and they did." Barnes appeals.

ANALYSIS

I. *Barnes's first assignment of error is waived.*

Barnes first asserts that "[t]he . . . *jury* . . . erred," and rendered apparently inconsistent verdicts, when it found him guilty of unlawfully shooting into an occupied building and unlawful destruction of property, while simultaneously acquitting him of second-degree murder and use of a firearm in the commission of a murder. (Emphasis added). Since Barnes assigns error to the jury, and not to the trial court, Barnes's first assignment of error fails to comport with the Rules of the Supreme Court of Virginia and is waived.

We are a "court of limited jurisdiction," with the boundaries of our jurisdiction fixed in place by statute. *Tesla, Inc. v. Va. Auto. Dealers Ass'n*, 68 Va. App. 509, 512 (2018) (quoting *Commonwealth v. Lancaster*, 45 Va. App. 723, 730 (2005)). Pertinent here, Code § 17.1-406(A) provides that an "aggrieved party may appeal to the Court of Appeals from any final conviction in a circuit court of . . . a crime." Although juries render verdicts, they do not enter final orders of conviction. The latter is a function that rests solely in the courts.

Accordingly, Code § 17.1-406(A) gives to this Court jurisdiction to review final convictions entered by trial courts. This general proposition, and limitation, is enshrined in the Rules of the Supreme Court of Virginia, which provide that assignments of error must "identify with specificity the error committed by the trial court." *Findlay v. Commonwealth*, 287 Va. 111, 115 (2014) (citing Rule 5A:12(c)(1)(ii)). Although our Supreme Court, in *Findlay*, interpreted Rule 5A:12(c)(1)(ii), its determination that an assignment of error must "identify with specificity

- 4 -

the error committed by the trial court," *id.*, applies no less to Rule 5A:20(c)(2), the text of which is near-identical to Rule 5A:12(c)(1)(ii). *Compare* Rule 5A:12(c)(1)(ii) ("An assignment of error which does not address the findings, rulings, or failures to rule on issues in the trial court . . . from which an appeal is taken, . . . is not sufficient."), *with* Rule 5A:20(c)(2) ("An assignment of error that does not address the findings, rulings, or failures to rule on issues in the trial court . . . from which an appeal is taken, . . . is not sufficient."). Likewise, Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless . . . stated with reasonable certainty at the time of the ruling."

It follows that for an assignment of error to comply with Rule 5A:20(c)(2) and Rule 5A:18, it must identify an erroneous ruling, finding, or failure to rule *by the trial court*. The Rules of the Supreme Court are not surplusage, nor are they a menu from which litigants may freely pick and choose. They "are rules and not suggestions; we expect litigants before this Court to abide by them." *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (quoting *Eaton v. Wash. Cty. Dep't of Soc. Servs.*, 66 Va. App. 317, 332 n.1 (2016)).

Here, Barnes challenges the findings of the jury, not the trial court. In other words, Barnes fails to state the findings or rulings of the trial court he intends to challenge. Accordingly, Barnes's first assignment of error does not comply with Rule 5A:20(c)(2) and is waived.[2]

> II. *The trial court did not err in denying Barnes's motion to set aside the jury verdicts as inconsistent because consistency in jury verdicts is not required.*

Barnes also argues that the trial court erred when it denied his motion to set aside the jury verdicts, failing to hold that the verdicts were inconsistent as a matter of law. The jury acquitted Barnes of second-degree murder and use of a firearm in the commission of a murder, while

---

[2] For this reason, we do not consider the arguments Barnes raises under his first assignment of error.

finding Barnes guilty of unlawfully discharging a firearm into an occupied building and unlawful destruction of property. Barnes contends that these verdicts are inconsistent, since "the jury . . . determined that [he] acted *lawfully* (self defense) when shooting at the decedent with regard to murder and the related firearms offense,[3] but acted *unlawfully* when the same conduct damaged property around the decedent." (Emphases added). Barnes argues that the inconsistent verdicts constitute an "actual irregularity." In so arguing, Barnes impliedly claims that the apparent inconsistency here defeats the well-established rule that "[c]onsistency in jury verdicts is not required." *Gaines v. Commonwealth*, 39 Va. App. 562, 570 (2003) (en banc).

"Verdicts or convictions are inconsistent when 'the essential elements in the count wherein the accused is acquitted are identical and necessary to proof of conviction on the guilt count.'" *Akers v. Commonwealth*, 31 Va. App. 521, 528 n.3 (2000) (quoting *State v. Meyer*, 832 P.2d 357, 362 (Kan. Ct. App. 1992)). However, "[t]he issue of inconsistent verdicts implicates no constitutional guarantee," *Akers*, 31 Va. App. at 529, and, as noted, "[c]onsistency in jury verdicts is not required," *Gaines*, 39 Va. App. at 570.

Instead, "[w]here a jury renders inconsistent verdicts, 'a search of the trial record in an attempt to reconcile such inconsistency is neither appropriate nor required.'" *Akers*, 31 Va. App. at 529 (quoting *Wolfe v. Commonwealth*, 6 Va. App. 640, 650 (1988)). Moreover, such a probing search would be fruitless. "[B]ecause Virginia is 'more careful than most states to protect the inviolability and secrecy of jurors' deliberations,' a court, in a case like this, is unlikely to discover what motivated the jury." *Gaines*, 39 Va. App. at 570 (quoting *Reed v.*

---

[3] Barnes advances the bare and mistaken contention that the jury found that he acted in self-defense. In this case, no less than in any other case, we do not know why the jury acquitted Barnes of some of the charges. While we may conjecture the jury's motivation, such is merely imaginative reasoning and offers no window into the actual motivations and beliefs of the jurors. We simply do not know why the jury acquitted Barnes of the second-degree murder and use of a firearm in commission of a murder charges.

*Commonwealth*, 239 Va. 594, 598 (1990)).  Hence, we have recognized that "[j]ury verdicts may appear inconsistent because the jury has elected through mistake, compromise, or lenity to acquit or to convict of a lesser offense for one charged crime that seems in conflict with the verdict for another charged offense." *Kovalaske v. Commonwealth*, 56 Va. App. 224, 233 (2010) (quoting *Pugliese v. Commonwealth*, 16 Va. App. 82, 96 (1993)).

In sum, "[a]s long as the evidence supports [the] verdicts, they 'will be upheld, despite the apparent inconsistency.'" *Akers*, 31 Va. App. at 529 (quoting *Pugliese*, 16 Va. App. at 96).  This principle, long embedded in our law, has applied even where an appellant was acquitted of credit card theft but convicted of credit card fraud.  *Kovalaske*, 56 Va. App. at 233.  In *Kovalaske*, we affirmed the trial court, finding the evidence sufficient to convict the appellant of credit card fraud and explaining that "[d]espite the apparent inconsistency of a verdict, courts may uphold inconsistent verdicts, provided that the evidence supports the verdict challenged on appeal." *Id.*

But Barnes attempts to side-step these principles, and the root proposition that "[c]onsistency in jury verdicts is not required," *Gaines*, 39 Va. App. at 570, by adducing a *different* standard by which to evaluate apparently inconsistent jury verdicts.  Barnes argues that the inconsistency here constituted an "actual irregularity," and thus, the verdicts should have been set aside.

The language of "actual irregularity" does recur in our inconsistent-verdict jurisprudence, but sparsely.  The term "actual irregularity" was first introduced in *Akers v. Commonwealth*. There, we grappled with whether a trial court could "render inconsistent verdicts." 31 Va. App. at 528.  In answering this question, we found instructive the Maryland Court of Appeals' decision in *Shell v. State*, 512 A.2d 358 (Md. 1986), whose rationale we adopted "as applicable

to elemental inconsistency in bench trial verdicts." *Id.* at 530. We noted the observation of Maryland's high court that

> [c]onvictions based on inconsistent jury verdicts are tolerated because of the singular role of the jury in the criminal justice system. . . . *There is a "reluctance to interfere with the results of unknown jury interplay," at least without proof of "actual irregularity."* . . . Inconsistencies may be the product of lenity, mistake, or a compromise to reach unanimity, and . . . the continual correction of such matters would undermine the historic role of the jury as arbiter of questions put to it. In the present case, however, the inconsistent verdicts were rendered by a judge, not by a jury. [The above rationale] does not justify inconsistent verdicts from the trial judge.

*Id.* at 531 (all alterations but first in original) (emphasis added) (quoting *Shell*, 512 A.2d at 362).

The quoted passage from *Shell* has featured four times in the opinions of this Court, all in cases addressing bench trial verdicts. *See Meade v. Commonwealth*, 74 Va. App. 796, 809-10 (2022); *Taylor v. Commonwealth*, No. 0687-17-1, slip op. at 13, 2018 Va. App. LEXIS 160, at *18 (June 12, 2018); *Cradle v. Commonwealth*, No. 1104-13-1, slip op. at 3, 2014 Va. App. LEXIS 204, at *3 (May 27, 2014); *Cleveland v. Commonwealth*, 38 Va. App. 199, 203-04 (2002). And all of these cases have reproduced the italicized sentence stating, "There is a 'reluctance to interfere with the results of unknown jury interplay,' at least without proof of 'actual irregularity.'" *Akers*, 31 Va. App. at 531 (quoting *Shell*, 512 A.2d at 362).

Barnes's argument is organized around the premise that, in *Akers*, we carved out an "actual irregularity" exception to the general principle that consistency is not required in jury verdicts. But this Court did not create such an exception. We were unequivocal in *Akers* that we adopted the Maryland Court of Appeals' rationale in *Shell* only "as applicable to elemental inconsistency in *bench* trial verdicts." *Id.* at 530 (emphasis added). The *Shell* court's glancing recognition that "[t]here is a 'reluctance to interfere with the results of unknown jury interplay,' at least without proof of 'actual irregularity,'" *id.* at 531 (quoting *Shell*, 512 A.2d at 362),

- 8 -

addresses inconsistency in jury verdicts, *not* the issue of elemental inconsistency in bench trial verdicts.

Even had the Maryland Court of Appeals suggested the existence of an exception to the general principle that consistency is not required in jury verdicts, we did not adopt this view. Rather, this line of text from *Akers*—that "[t]here is a 'reluctance to interfere with the results of unknown jury interplay,' at least without proof of 'actual irregularity,'" *id.* (quoting *Shell*, 512 A.2d at 362)—bears the characteristics of dicta. And "[d]icta cannot 'serve as a source of binding authority in American jurisprudence.'" *Newman v. Newman*, 42 Va. App. 557, 566 (2004) (en banc) (emphasis omitted) (quoting *United States v. Pasquantino*, 336 F.3d 321, 329 (4th Cir. 2009) (en banc))).[4]

What constitutes an actual irregularity, or what circumstances could combine to create an actual irregularity, is not the issue presented here. Barnes argues that an "actual irregularity" is nothing more than an apparent inconsistency in a jury's verdicts. But mere inconsistency in a jury's verdicts does not establish per se error. Nor does such apparent inconsistency, without more, *become* reversible error. Our Supreme Court has resisted carving out exceptions to the general rule regarding consistency of jury verdicts, reiterating that "verdicts cannot be upset by speculation or inquiry." *McQuinn v. Commonwealth*, 298 Va. 456, 459 (2020) (quoting *Reed*, 239 Va. at 597). In adjudicating whether an exception to this rule should exist in cases "involving compound and predicate offenses," the Supreme Court answered unequivocally: No.

---

[4] By noting explicitly that we had adopted the *Shell* rationale only "as applicable to elemental inconsistency in bench trial verdicts," *Akers*, 31 Va. App. at 530, we cordoned off as dicta those portions of the quoted passage not addressing inconsistency in bench trial verdicts. Put differently, the manner in which we adopted *Shell* established that anything outside of those parameters was non-essential to our holding.

*Id.* at 460 (quoting *Reed*, 239 Va. at 597). It determined that "such an exception 'threatens to swallow the rule.'" *Id.* (quoting *Reed*, 239 Va. at 597).[5]

As the Commonwealth argues, Virginia law does address "irregularities" with respect to, among other things, juror misconduct and juror lists. *See Caterpillar Tractor Co. v. Hulvey*, 233 Va. 77, 82 (1987) ("[N]either the sole fact of irregularity nor the mere suspicion of injustice based upon the irregularity is sufficient to warrant setting aside a verdict." (quoting *Litz v. Harman*, 151 Va. 363, 375 (1928)); Code § 8.01-352(A) (providing that, "[p]rior to the jury being sworn," "objections may be made without leave of court" regarding, e.g., "the irregularity in any list or lists of jurors made by the clerk from names drawn from the jury box"). But we need not decide today whether any such irregularity amounts to an "actual irregularity" under *Akers*. That is, we decline Barnes's invitation to state what an "actual irregularity" is, since we know what it is not: an apparently inconsistent jury verdict.

III. *The evidence supports the verdicts Barnes challenges on appeal.*

Because Barnes's argument, at base, is that the jury verdicts in this case were inconsistent, "they 'will be upheld, despite the apparent inconsistency,'" "[a]s long as the evidence supports both verdicts." *Akers*, 31 Va. App. at 529 (quoting *Pugliese*, 16 Va. App. at 96); *see also Kovalaske*, 56 Va. App. at 233 ("Despite the apparent inconsistency of a verdict, courts may uphold inconsistent verdicts, provided that the evidence supports the verdict challenged on appeal."). And here, the evidence supported the verdicts Barnes challenges on appeal. Specifically, the evidence supported the jury's finding that Barnes unlawfully shot into two occupied buildings and, when he did so, unlawfully damaged them.

---

[5] As the Supreme Court of the United States observed in *United States v. Powell*, 469 U.S. 57, 67 (1984), "a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts."

The first offense, unlawfully discharging a firearm into an occupied building, is spelled out in Code § 18.2-279, which provides:

> [I]f any person maliciously discharges a firearm within any building when occupied by one or more persons in such a manner as to endanger the life or lives of such person or persons, . . . the person so offending is guilty of a Class 4 felony. In the event of the death of any person, resulting from such malicious shooting . . . the person so offending is guilty of murder in the second degree.

"If any such act be done unlawfully, but not maliciously, the person so offending is guilty of a Class 6 felony." *Id.* Barnes's second offense, unlawful destruction of property, is delineated in Code § 18.2-137(A), which provides that "[i]f any person unlawfully destroys, defaces, damages, or removes without the intent to steal any property, real or personal, not his own, . . . he shall be guilty of a Class 3 misdemeanor."

Under both statutes, criminal liability attaches when a person engages in the unlawful discharge of a firearm into an occupied building or the unlawful destruction of property. "'Unlawfully[]' . . . describes conduct that merely demonstrates 'criminal negligence.'" *Bryant v. Commonwealth*, 295 Va. 302, 310 (2018) (quoting *Gooden v. Commonwealth*, 226 Va. 565, 571 (1984) (interpreting Code § 18.2-279)); *accord Scott v. Commonwealth*, 58 Va. App. 35, 50 (2011) (interpreting Code § 18.2-137(A)). "'Criminal negligence' is judged under an objective standard and may be found to exist where the offender either knew or should have known the probable results of h[is] acts." *Bryant*, 295 Va. at 310 (quoting *Riley v. Commonwealth*, 277 Va. 467, 483-84 (2009)).

Accordingly, "to sustain a conviction under Code § 18.2-279, [unlawfully discharging a firearm into an occupied building,] the Commonwealth need not prove that the defendant had the specific intent to shoot at or against a particular building." *Ellis v. Commonwealth*, 281 Va. 499, 506 (2011). "Rather, the evidence need only show that a defendant . . . knew or should have known that an occupied building or buildings were in his line of fire." *Id.* Similarly, Code

- 11 -

§ 18.2-137(A), addressing the unlawful destruction of property, does not require proof of a specific intent to cause damage to another's property. Instead, proof that the accused "knew or should have known" that the acts were likely to cause such damage or destruction is sufficient. *See Scott*, 58 Va. App. at 50 ("Code § 18.2-137(A) . . . attach[es] criminal liability when a person 'unlawfully' damages the property of another.").

The record shows that Barnes "knew or should have known" that the businesses behind Powell were occupied and "in his line of fire." *Ellis*, 281 Va. at 506. Barnes was armed when Powell appeared in front of him in a parking lot near two occupied stores. During the chaos that ensued, Barnes aimed and repeatedly fired his gun at Powell. Two of the bullets hit Powell, while three others struck the entrances of the stores directly behind him, shattering the glass doors of both stores. Since the shooting happened in the afternoon during normal business hours, it was reasonable for the jury to conclude that Barnes knew or should have known that the stores were occupied. Indeed, that Barnes that day visited one of the stores, and then sat in a vehicle shortly before the shooting, underscores this point.

Considering this evidence, the jury could infer that although Barnes may not have specifically intended to shoot the occupied stores or damage them, he knew or should have known what would likely result, not least because the stores were directly in the line of fire. *See Ellis*, 281 Va. at 506 ("[T]he evidence need only show that a defendant . . . knew or should have known that an occupied building or buildings were in his line of fire."); *Scott*, 58 Va. App. at 51 ("Code § 18.2-137(A) punishes a person less severely for 'unlawfully' damaging the property of another, as opposed to 'intentionally' damaging the property of another as proscribed by Code § 18.2-137(B)[;] it follows that the word 'unlawfully' must connote a less culpable mental state . . . . In general, the lowest level of *mens rea* is criminal negligence.").

Accordingly, the evidence was sufficient to sustain Barnes's convictions for unlawfully shooting into an occupied building and unlawful destruction of property.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*